**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| LJILJANA ZELEN KARADZIC,<br><br>    Plaintiff,<br><br>  v.<br><br>BRADLEY T. SMITH, in his official capacity as Director, Office of Foreign Assets Control, *et al.*,<br><br>    Defendants. | Civil Action No. 1:23-cv-01226 (TSC) |

**<u>MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT AND IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS
OR, IN THE ALTERNATIVE, CROSS-MOTION FOR SUMMARY JUDGMENT</u>**

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................ 2

I.      Statutory and Regulatory Framework .................................................................. 2

        A.      The International Emergency Economic Powers Act ............................. 2

        B.      Economic Sanctions against War Criminals and their Supporters in the
                Western Balkans Region ......................................................................... 4

II.     The Government's Imposition of Sanctions against Plaintiff ............................. 6

        A.      The President's Annex Identifications of Radovan Karadzic and Plaintiff ........... 6

        B.      Plaintiff's Request for Removal from the SDN List ............................... 7

        C.      OFAC's Denial of Plaintiff's Petition ..................................................... 8

        D.      Plaintiff's Amended Complaint .............................................................. 14

LEGAL STANDARDS OF REVIEW ........................................................................... 15

DISCUSSION ............................................................................................................... 16

I.      Plaintiff's Unreasonable Delay Claim Fails ..................................................... 16

        A.      Plaintiff's Claim is Moot ....................................................................... 16

        B.      The Court Otherwise Lacks Jurisdiction over Count I .......................... 22

        C.      OFAC Did Not Unreasonably Delay its Decision on Plaintiff's Petition ............ 26

                1.      Factors One and Two ................................................................... 27

                2.      Factors Three and Five ................................................................ 31

                3.      Factor Four .................................................................................. 33

                4.      Factor Six .................................................................................... 35

II.     OFAC's Decision Accords with the APA ......................................................... 36

        A.      OFAC's Decision is Entitled to Substantial Deference ........................ 36

        B.      OFAC's Well-Reasoned Decision Easily Satisfies the APA's Standard .............. 37

III.    Plaintiff Has Failed to State a Claim for Attorney's Fees ................................. 45

i

CONCLUSION ................................................................................................................... 45

## TABLE OF AUTHORITIES

### CASES

*Action All. of Senior Citizens of Greater Phila. v. Heckler*,
   789 F.2d 931 (D.C. Cir. 1986) ................................................................. 21

*Advanced Energy United, Inc. v. FERC*,
   82 F.4th 1095 (D.C. Cir. 2023) ............................................................... 40

*Am. Hosp. Ass'n v. Burwell*,
   812 F.3d 183 (D.C. Cir. 2016) ......................................................... 23, 31

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ............................................................................... 15

*Ashcroft v. Mattis*,
   431 U.S. 171 (1977) ............................................................................... 21

*Ass'n of Am. Med. Colls. v. United States*,
   217 F.3d 770 (9th Cir. 2000) ................................................................. 21

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ............................................................................... 15

*Beshir v. Holder*,
   10 F. Supp. 3d 165 (D.D.C. 2014) ....................................................... 24

*Beyond Pesticides/Nat'l Coal. Against the Misuse of Pesticides v. Johnson*,
   407 F. Supp. 2d 38 (D.D.C. 2005) ................................................. 20, 35

*Chowdhury v. Blinken*,
   Case No. 1:21-cv-1205-RCL, 2022 WL 136795 (D.D.C. Jan. 14, 2022) ................................ 35

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
   401 U.S. 402 (1971) ......................................................................... 34, 36

*City of Houston v. Dep't of Hous. & Urb. Dev.*,
   24 F.3d 1421 (D.C. Cir. 1994) ................................................... 20, 21, 22

*Cobell v. Norton*,
   240 F.3d 1081 (D.C. Cir. 2001) ............................................................. 31

*Conservation Force, Inc. v. Jewell*,
   733 F.3d 1200 (D.C. Cir. 2013) ............................................................. 22

*Ctr. for Sci. in the Pub. Interest v. U.S. FDA*,
   74 F. Supp. 3d 295 (D.D.C. 2014) ....................................................... 34

*Da Costa v. Immigr. Inv. Program Off.*,
    643 F. Supp. 3d 1 (D.D.C. 2022), *aff'd*, 80 F.4th 330 (D.C. Cir. 2023) ................................. 31

*Dames & Moore v. Regan*,
    453 U.S. 654 (1981) .......................................................................................................... 3, 27, 39

*Dastagir v. Blinken*,
    557 F. Supp. 3d 160 (D.D.C. 2021) ................................................................................... 32, 33

*Dehghanighanatghestani v. Mesquita*,
    Civ. A. No. 22-2595 (CKK), 2022 WL 4379061 (D.D.C. Sept. 22, 2022) ............................. 32

*Del Monte Fresh Produce Co. v. United States*,
    570 F.3d 316 (D.C. Cir. 2009) ........................................................................................... 18, 21

*Devani v. U.S. Citizenship & Immigr. Servs.*,
    No. 22-cv-01932 (DLF), 2023 WL 2913645 (D.D.C. Apr. 12, 2023) ............................... 31, 32

*Fares v. Smith*,
    901 F.3d 315 (D.C. Cir. 2018) ................................................................................................. 27

*Fla. Power & Light Co. v. Lorion*,
    470 U.S. 729 (1985) ................................................................................................................. 36

*Fulmen Co. v. OFAC*,
    547 F. Supp. 3d 13 (D.D.C. 2020) ..................................................................................... 23, 30

*Grant v. Vilsack*,
    892 F. Supp. 2d 252 (D.D.C. 2012) ........................................................................................ 18

*Hi-Tech Pharmacal Co. v. U.S. Food & Drug Admin.*,
    587 F. Supp. 2d 1 (D.D.C. 2008) ............................................................................................ 26

*Holder v. Humanitarian L. Project*,
    561 U.S. 1 (2010) ..................................................................................................................... 25

*\*Holy Land Found. for Relief & Dev. v. Ashcroft*,
    219 F. Supp. 2d 57 (D.D.C. 2002) ................................................................................... *passim*

*Honig v. Doe*,
    484 U.S. 305 (1988) ................................................................................................................. 16

*In re Barr Lab'ys, Inc.*,
    930 F.2d 72 (D.C. Cir. 1991) ............................................................................................. 33, 35

*In re Public Employees for Environmental Responsibility*,
    957 F.3d 267 (D.C. Cir. 2020) ................................................................................................. 35

*Islamic Am. Relief Agency v. Gonzales,*
    477 F.3d 728 (D.C. Cir. 2007) ......................................................................... 24, 27

*Jesner v. Arab Bank, PLC,*
    584 U.S. ---, 138 S. Ct. 1386 (2018) ..................................................................... 25

*Joumaa v. Mnuchin,*
    798 F. App'x 667 (D.C. Cir. 2020) ........................................................................ 44

*Kadi v. Geithner,*
    42 F. Supp. 3d 1 (D.D.C. 2012) ...................................................................... 16, 30

*\*Karadzic v. Gacki,*
    602 F. Supp. 3d 103 (D.D.C. 2022) ............................................................... *passim*

*Karam v. Garland,*
    Civ. A. No. 21-0915 (CKK), 2022 WL 4598626 (D.D.C. Sept. 30, 2022) ............... 24

*Khadr v. United States,*
    529 F.3d 1112 (D.C. Cir. 2008) ............................................................................ 15

*KindHearts for Charitable Humanitarian Development, Inc. v. Geithner,*
    647 F. Supp. 2d 857 (N.D. Ohio 2009) ............................................................ 28, 29

*Kokajko v. FERC,*
    837 F.2d 524 (1st Cir. 1988) ........................................................................... 29, 30

*Lopez Bello v. Smith,*
    651 F. Supp. 3d 20 (D.D.C. Dec. 21, 2022), *appeal filed,*
    No. 23-5036 (D.C. Cir. Feb. 21, 2023) .................................................................. 20

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) .............................................................................................. 22

*Mashpee Wampanoag Tribal Council, Inc. v. Norton,*
    336 F.3d 1094 (D.C. Cir. 2003) ............................................................... 27, 29, 33

*Meina Xie v. Kerry,*
    780 F.3d 405 (D.C. Cir. 2015) .............................................................................. 26

*Milligan v. Pompeo,*
    502 F. Supp. 3d 302 (D.D.C. 2020), *appeal dismissed sub nom.,*
    *Milligan v. Blinken,* 2021 WL 4768119 (D.C. Cir. Sept. 21, 2021) ....................... 28

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) ................................................................................................ 36

*Nat. Res. Def. Council, Inc. v. Sec. & Exch. Comm'n*,
  606 F.2d 1031 (D.C. Cir. 1979) ...................................................................... 23

*Newdow v. Roberts*,
  603 F.3d 1002 (D.C. Cir. 2010) ................................................................ 18, 19

*Norton v. S. Utah Wilderness All.*,
  542 U.S. 55 (2004) .................................................................................. 23, 26

*NTCH, Inc. v. FCC*,
  841 F.3d 497 (D.C. Cir. 2016) ........................................................................ 16

*Olenga v. Gacki*,
  507 F. Supp. 3d 260 (D.D.C. 2020) ........................................................... *passim*

*Orlov v. Howard*,
  523 F. Supp. 2d 30 (D.D.C. 2007) .................................................................. 24

*Orvis v. Brownell*,
  345 U.S. 183 (1953) ......................................................................................... 3

*Pac. Shores Subdivision Cal. Water Dist. v. U.S. Army Corps of Eng'rs*,
  448 F. Supp. 2d 1 (D.D.C. 2006) ................................................................... 34

*Palisades Gen. Hosp. Inc. v. Leavitt*,
  426 F.3d 400  (D.C. Cir. 2005) ................................................................. 44, 45

*Pejcic v. Gacki*,
  Case No. 19-cv-02437 (APM), 2021 WL 1209299 (D.D.C. Mar. 30, 2021) .................... *passim*

*People for the Ethical Treatment of Animals, Inc. v. U.S. Fish & Wildlife Serv.*,
  59 F. Supp. 3d 91 (D.D.C. 2014) ............................................................... 19, 22

*Prisology v. Fed. Bureau of Prisons*,
  74 F. Supp. 3d 88 (D.D.C. 2014), *aff'd*, 852 F.3d 1114 (D.C. Cir. 2017) ............................ 15

*Propper v. Clark*,
  337 U.S. 472 (1949) ......................................................................................... 3

*Pub. Serv. Comm'n of Utah v. Wycoff Co.*,
  344 U.S. 237 (1952) ........................................................................................ 21

*Pub. Utils. Comm'n of Cal. v. FERC*,
  236 F.3d 708 (D.C. Cir. 2001) ........................................................................ 17

*Rakhimov v. Gacki*,
  Civ. A. No. 19-2554 (JEB), 2020 WL 1911561 (D.D.C. Apr. 20, 2020),
  *appeal dismissed*, 2020 WL 4107145 (D.C. Cir. July 1, 2020) ...................................... 2, 20, 42

*Regan v. Wald*,
   468 U.S. 222 (1984) ................................................................................................. 3

*Reid v. Hurwitz*,
   920 F.3d 828 (D.C. Cir. 2019) ............................................................................... 17

*Roe v. Wade*,
   410 U.S. 113 (1973) ............................................................................................... 20

*SecurityPoint Holdings, Inc. v. TSA*,
   836 F.3d 32 (D.C. Cir. 2016) ................................................................................ 21

*Small Refiner Lead Phase-Down Task Force v. U.S. EPA*,
   705 F.2d 506 (D.C. Cir. 1983) .............................................................................. 37

*Spencer v. Kemna*,
   523 U.S. 1 (1998) ................................................................................................... 20

*Sulemane v. Mnuchin*,
   Civ. A. No. 16-1822 (TJK), 2019 WL 77428 (D.D.C. Jan. 2, 2019) ...................... 23

*\*Telecommunications Research & Action Center v. FCC*,
   750 F.2d 70 (D.C. Cir. 1984) ................................................................. 26, 27, 33

*Telles v. Mayorkas*,
   Civ. A. No. 21-395 (TJK), 2022 WL 2713349 (D.D.C. July 13, 2022) .................. 32

*Tesfaye v. Blinken*,
   Civ. A. No. 22-411 (CKK), 2022 WL 4534863 (D.D.C. Sept. 28, 2022) ............... 32

*TOMAC v. Norton*,
   193 F. Supp. 2d 182 (D.D.C. 2002), *aff'd sub nom.*,
   *TOMAC, Taxpayers of Mich. Casinos v. Norton*, 433 F.3d 852 (D.C. Cir. 2006) .................. 34

*Udall v. Tallman*,
   380 U.S. 1 (1965) ................................................................................................... 43

*United States v. Williams*,
   341 U.S. 58 (1951) ................................................................................................. 43

*Weinstein v. Bradford*,
   423 U.S. 147 (1975) ................................................................................. 17, 18, 19

*White v. N.H. Dep't of Emp. Sec.*,
   455 U.S. 445 (1982) ............................................................................................... 45

*Wilbur v. U.S. ex rel. Kadrie*,
   281 U.S. 206 (1930) ............................................................................................... 23

*Williams v. Lew,*
  819 F.3d 466 (D.C. Cir. 2016) ............................................................................... 22

*Xiaoda Liu v. Mayorkas,*
  548 F. Supp. 3d 1 (D.D.C. 2021) .......................................................................... 32

*Yacoub v. Blinken,*
  Civ. A. No. 21-cv-983 (TSC), 2022 WL 4598681 (D.D.C. Sept. 30, 2022) ......... 26, 27, 28, 33

*Zevallos v. Obama,*
  10 F. Supp. 3d 111 (D.D.C. 2014), *aff'd,*
  *Zevallos v. Obama,* 793 F.3d 106 (D.C. Cir. 2015) ............................................. 16, 17, 37, 38

*\*Zevallos v. Obama,*
  793 F.3d 106 (D.C. Cir. 2015) ............................................................................. 16, 28, 38, 43

**STATUTES**

5 U.S.C. § 555 ........................................................................................................... 26

5 U.S.C. § 706 ..................................................................................................... *passim*

28 U.S.C. § 2412 ................................................................................................. 15, 45

50 U.S.C. §§ 1701-1709 ............................................................................................. 1

50 U.S.C. § 1701 ............................................................................................. 3, 32, 43

50 U.S.C. § 1702 ..................................................................................... 3, 8, 27, 32

50 U.S.C. § 1704 ....................................................................................................... 23

50 U.S.C. § 4305 ......................................................................................................... 3

**RULES**

Fed. R. Civ. P. 12 ................................................................................................. 15, 16

Fed. R. Civ. P. 56 ....................................................................................................... 16

**REGULATIONS**

31 C.F.R. § 501.807 ........................................................................................... *passim*

31 C.F.R. § 588.201 note 1 ..................................................................................... 5, 6

31 C.F.R. § 588.802 ..................................................................................................... 5

Blocking Assets and Prohibiting Transactions with Significant Narcotics Traffickers,
   Exec. Order 12978, 60 Fed. Reg. 54,579 (Oct. 21, 1995) ......................................................... 4

Blocking Property of Persons Who Threaten International Stabilization Efforts in the Western
   Balkans,
   Exec. Order 13219, 66 Fed. Reg. 34,777 (June 26, 2001)................................................. *passim*

Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to
   Commit, or Support Terrorism,
   Exec. Order 13224, 66 Fed. Reg. 49,079 (Sept. 23, 2001) ......................................................... 4

Termination of Emergencies with Respect to Yugoslavia and Modification of Executive
   Order 13219 of June 26, 2001,
   Exec. Order 13304, 68 Fed. Reg. 32,315 (May 28, 2003)................................................. *passim*

Modernizing Sanctions to Combat Terrorism,
   Exec. Order 13886, 84 Fed. Reg. 48,041 (Sept. 9, 2019) ........................................................ 24

88 Fed. Reg. 40,683 (June 20, 2023) ............................................................................................ 5

## OTHER AUTHORITIES

65th Cong. Ch. 106, 40 Stat. 411 (1917) (codified as amended at 50 U.S.C. §§ 4301-4341).... 2, 3

OFAC, *Alphabetical Listing of Specially Designated Nationals and Blocked Persons,*
   https://www.treasury.gov/ofac/downloads/sdnlist.pdf.................................................................. 6

S. Rep. No. 95-466 (1977), *reprinted in* 1977 U.S.C.C.A.N. 4540................................................ 3

U.S. Dep't of the Treasury, *Treasury Removes Sanctions Imposed on Turkish Ministries and
   Senior Officials Following Pause of Turkish Operations in Northeast Syria* (Oct. 23, 2019),
   https://home.treasury.gov/news/press-releases/sm801 ............................................................ 34

U.S. Dep't of the Treasury, *Treasury Sanctions Facilitator for Attempted Arms Deals Between
   North Korea and Russia* (Mar. 30, 2023),
   https://home.treasury.gov/news/press-releases/jy1377.............................................................. 34

U.S. Dep't of the Treasury, *Treasury Sanctions Officials of Iranian Intelligence Agency
   Responsible for Detention of U.S. Nationals in Iran* (Apr. 27, 2023),
   https://home.treasury.gov/news/press-releases/jy1444.............................................................. 34

U.S. Dep't of the Treasury, *Treasury Targets Additional Sources of Support and Financing
   to Hamas* (Oct. 27, 2023),
   https://home.treasury.gov/news/press-releases/jy1845.............................................................. 33

## INTRODUCTION

Pursuant to Article II of the Constitution, as well as powers conferred on him by Congress in the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701-1709 ("IEEPA"), the President has the authority to impose economic sanctions on persons and entities in response to declared national emergencies.  To address the national security and foreign policy threat posed by extremist violence in the Western Balkans and acts aimed at destabilizing efforts to establish peace, security, and stability in that region, the President in 2001 declared a national emergency and issued Executive Order 13219, later amended by Executive Order 13304.  In accordance with these authorities, the President in 2003 blocked the assets of Radovan Karadzic, a war criminal who orchestrated ethnic cleansing campaigns in Bosnia and Herzegovina, as well as the assets of Radovan Karadzic's family members, including Plaintiff Ljiljana Zelen Karadzic.

In 2020, Plaintiff petitioned the U.S. Department of the Treasury, Office of Foreign Assets Control ("OFAC") for relief from the President's decision.  Plaintiff argued that she was not involved in the crimes committed by Radovan Karadzic and that any reasons for blocking her assets no longer applied.  OFAC then began its extensive inter-agency process for determining whether removing Plaintiff from the list of Specially Designated Nationals and Blocked Persons ("SDNs") would be consistent with the national security and foreign policy goals of the United States.  Based on a thorough review of Plaintiff's submissions and both classified and unclassified reporting, OFAC denied Plaintiff's petition in October 2023, finding that Plaintiff materially assisted and provided support to Radovan Karadzic, and that Plaintiff actively obstructed, or poses a significant risk of actively obstructing, the Dayton Accords or the Conclusions of the Peace Implementation Conference held in London on December 8-9, 1995.

Raising claims under the Administrative Procedure Act ("APA"), Plaintiff now challenges

OFAC's treatment of her petition.  She first argues that the agency's decision was unreasonably delayed.  But the Court lacks jurisdiction over that claim, both because it is moot and because Plaintiff cannot identify an unequivocal Congressional command regarding the timing of OFAC's decisions on delisting petitions.  Moreover, there is no basis to find that OFAC engaged in unreasonable delay, particularly as a bright-line rule cannot be applied to such decisions given their national security and foreign policy implications.  Second, Plaintiff contends that OFAC's decision is arbitrary and capricious.  That claim is also without merit.  OFAC denied Plaintiff's petition after a careful review of her conduct prior to the President's decision, events that occurred after the decision, and foreign policy guidance received from the Department of State.  Plaintiff's conclusory denials, by contrast, do nothing to undermine the reasonableness of the agency's decision, which is fully supported by the administrative record.  Finally, Plaintiff pleads a cause of action for attorney's fees, which is both procedurally improper and premature.

Accordingly, and for the reasons discussed more fully below, the Court should deny Plaintiff's motion for summary judgment and grant Defendants' motion to dismiss or, in the alternative, cross-motion for summary judgment.

## BACKGROUND

### I.    Statutory and Regulatory Framework

#### A.    The International Emergency Economic Powers Act

For nearly its entire history, the United States has utilized economic sanctions as a critical means to protect national security and achieve foreign policy goals.  *Rakhimov v. Gacki*, Civ. A. No. 19-2554 (JEB), 2020 WL 1911561, at *1 (D.D.C. Apr. 20, 2020), *appeal dismissed*, 2020 WL 4107145 (D.C. Cir. July 1, 2020).  During most of the twentieth century, U.S. sanctions programs were governed by the Trading With the Enemy Act ("TWEA"), enacted in 1917.  *See* 65th Cong.

Ch. 106, 40 Stat. 411, 411-16 (1917) (codified as amended at 50 U.S.C. §§ 4301-4341).  As amended in 1933, TWEA granted the President "broad authority" to "investigate, regulate . . . prevent or prohibit . . . transactions" in times of war or declared national emergencies.  50 U.S.C. § 4305(b)(1)(B); *see Dames & Moore v. Regan*, 453 U.S. 654, 672 (1981).  Although TWEA does not use the term "block," the authority it conveys to the Executive Branch to regulate, prevent, or prohibit transactions consistently has been interpreted to encompass the power to block or freeze the property of a person or entity.  *See, e.g.*, *Orvis v. Brownell*, 345 U.S. 183, 187-88 (1953); *Propper v. Clark*, 337 U.S. 472, 483-84 (1949).

In 1977, Congress amended TWEA and enacted IEEPA.  *See* S. Rep. No. 95-466, at 1-2 (1977), *reprinted in* 1977 U.S.C.C.A.N. 4540, 4541.  IEEPA limited TWEA's application to periods of declared wars, but also extended the President's authority to declared national emergencies.  *See Regan v. Wald*, 468 U.S. 222, 227-28 (1984).  Although the broad authorities granted to the President under IEEPA remain essentially the same as those under TWEA, with certain limited exceptions, *see id.* at 228, IEEPA requires the President to declare a national emergency "to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States," 50 U.S.C. § 1701(a).  Once such a national emergency is declared, IEEPA authorizes the President to:

> [R]egulate, direct and compel, nullify, void, prevent or prohibit, any . . . transfer . . . of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest . . . with respect to any property, subject to the jurisdiction of the United States . . . .

*Id.* § 1702(a)(1)(B).

Pursuant to this expansive authority, and in response to a variety of declared national emergencies, Presidents have imposed sanctions on many countries, including Iran, Burma, and

North Korea, as well as on individuals, such as narcotics traffickers, terrorists, and, as relevant here, war criminals and their supporters.  *E.g.*, Blocking Assets and Prohibiting Transactions with Significant Narcotics Traffickers, Exec. Order 12978, 60 Fed. Reg. 54,579 (Oct. 21, 1995); Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism, Exec. Order 13224, 66 Fed. Reg. 49,079 (Sept. 23, 2001); Termination of Emergencies with Respect to Yugoslavia and Modification of Executive Order 13219 of June 26, 2001, Exec. Order 13304, 68 Fed. Reg. 32,315 (May 28, 2003) ("EO 13304").

### B. Economic Sanctions against War Criminals and their Supporters in the Western Balkans Region

In June 2001, pursuant to IEEPA, the President issued Executive Order 13219, addressing "the actions of persons engaged in, or assisting, sponsoring, or supporting" either (1) "extremist violence in the former Yugoslav Republic of Macedonia, southern Serbia, the Federal Republic of Yugoslavia, and elsewhere in the Western Balkans region"; or (2) "acts obstructing implementation of the Dayton Accords in Bosnia or United Nations Security Council Resolution 1244 of June 10, 1999, in Kosovo."  Blocking Property of Persons Who Threaten International Stabilization Efforts in the Western Balkans, Exec. Order 13219, 66 Fed. Reg. 34,777, 34,777 (June 26, 2001) ("EO 13219").  The President determined that such actions "threaten the peace in or diminish the security and stability of those areas and the wider region, undermine the authority, efforts, and objectives of the United Nations, the North Atlantic Treaty Organization (NATO), and other international organizations and entities present in those areas and the wider region," and further "endanger the safety of persons participating in or providing support to the activities of those organizations and entities, including United States military forces and Government officials."  *Id*.  Based on this determination, the President concluded that "such actions constitute an unusual and extraordinary threat to the national security and foreign policy of the United States"

4

and declared "a national emergency to deal with that threat."  *Id*.; *see* 88 Fed. Reg. 40,683 (June 20, 2023) (continuing national emergency with respect to the Western Balkans).

In EO 13219, the President blocked all property and interests in property of persons listed in an Annex to the Order and persons meeting certain criteria as determined by the Secretary of the Treasury, in consultation with the Secretary of State.  EO 13219 § 1.  The President revised EO 13219 in May 2003 by issuing EO 13304.  *See generally* EO 13304.  EO 13304 not only includes a superseding Annex of persons whose property and interests in property are blocked by the President, but also revises the criteria for designation under EO 13219.  *Id.* §§ 2-3.  For example, EO 13219, as amended by EO 13304, authorizes the designation of persons whom the Secretary of the Treasury, in consultation with the Secretary of State, determines (1) "have actively obstructed, or pose a significant risk of actively obstructing . . . the Dayton Accords or the Conclusions of the Peace Implementation Conference held in London on December 8-9, 1995, including the decisions or conclusions of the High Representative, the Peace Implementation Council or its Steering Board, relating to Bosnia and Herzegovina"; or (2) "have materially assisted in, sponsored, or provided financial, material, or technological support for, or goods or services in support of, . . . any person listed in or designated pursuant to this order."  *Id.* § 3(a) (amending EO 13219 § 1(a)(ii)(C)-(D)).  The Order also authorizes the Secretary of the Treasury, in consultation with the Secretary of State, "to take such actions, including the promulgation of rules and regulations, and to employ all powers granted to the President by IEEPA and [the United Nations Participation Act], as may be necessary to carry out the purposes of this order."  *Id.* § 5.  The Secretary of the Treasury's authority has been delegated to OFAC.  31 C.F.R. § 588.802.

Persons identified by the President or designated by OFAC pursuant to EO 13304 (as well as other authorities) are referred to as SDNs.  *Id.* § 588.201 note 1.  OFAC maintains a list of such

individuals or entities whose assets are blocked; this list is known as the SDN List. *Id.*; *see* OFAC, *Alphabetical Listing of Specially Designated Nationals and Blocked Persons ("SDN List")*, https://www.treasury.gov/ofac/downloads/sdnlist.pdf. Once designated, a SDN may at any time "seek administrative reconsideration" of the designation or may "assert that the circumstances resulting in the designation no longer apply." 31 C.F.R. § 501.807. In doing so, the SDN "may submit arguments or evidence that the person believes establishes that insufficient basis exists for the designation," and may also "propose remedial steps on the person's part . . . which the person believes would negate the basis for designation." *Id.* § 501.807(a). After conducting a review, OFAC will "provide a written decision" to the SDN. *Id.* § 501.807(d). OFAC does not limit the number of times a SDN may seek to challenge the designation administratively. *See id.* § 501.807.

## II.    The Government's Imposition of Sanctions against Plaintiff

### A.    The President's Annex Identifications of Radovan Karadzic and Plaintiff

Among the individuals included in the Annex to EO 13304 was Radovan Karadzic. 68 Fed. Reg. at 32,319. During the 1990s, Radovan Karadzic served as a founding member of the Serbian Democratic Party ("SDS"), President of the SDS, President of the so-called Serbian Republic of Bosnia and Herzegovina, and Supreme Commander of its armed forces. Admin. R. ("AR") at 0007 n.3, 0077-78, 0332. On July 25, 1995, the International Criminal Tribunal for the former Yugoslavia ("ICTY") indicted Radovan Karadzic on two counts of genocide; five counts of crimes against humanity, including persecution, extermination, murder, deportation, and inhumane acts of forcible transfer; and four counts of war crimes, including murder, terror, unlawful attacks on civilians, and taking hostages. *Id.*; *see id.* at 0077-78 (describing allegations that Radovan Karadzic, among other heinous acts, "participated in a [joint criminal enterprise] to eliminate Bosnian Muslims in Srebrenica by killing men and boys and forcibly removing women,

young children and the elderly from the area"); *see also Karadzic v. Gacki*, 602 F. Supp. 3d 103, 108 (D.D.C. 2022); *Pejcic v. Gacki*, Case No. 19-cv-02437 (APM), 2021 WL 1209299, at *2 (D.D.C. Mar. 30, 2021).  At the time of his inclusion in the Annex to EO 13304, Radovan Karadzic was a fugitive from the ICTY.  AR at 0009, 0333-34; *see id.* at 0077 (noting that Radovan Karadzic was arrested on July 21, 2008); *see also Karadzic*, 602 F. Supp. 3d at 108.  Radovan Karadzic was ultimately "sentenced to life in prison for convictions of genocide, war crimes, and crimes against humanity." *Pejcic*, 2021 WL 1209299, at *2.

Also listed in the Annex were members of Radovan Karadzic's family, including his wife, Plaintiff Ljiljana Zelen Karadzic, and their children, Aleksandar Karadzic and Sonja Karadzic Jovicevic.  68 Fed. Reg. at 32,319, 32,322; *see* Am. Compl. ¶ 10, ECF No. 13; AR at 0010-11.

## B. Plaintiff's Request for Removal from the SDN List

Nearly 17 years later, by letter to OFAC dated April 24, 2020, Plaintiff, through counsel, requested her removal from the SDN List.  AR at 0059-60.  In her letter, Plaintiff noted that Radovan Karadzic was arrested in July 2008, transferred to the ICTY, and subsequently imprisoned. *Id.* at 0059.  Plaintiff asserted that "[s]he had nothing to do with the crimes for which her husband was convicted, and has never been charged with any crimes arising out of the war in the former Yugoslavia." *Id.*  Further, according to Plaintiff, the apprehension of Radovan Karadzic indicates that "the reasons for placing her on the [SDN] list are no longer . . . applicable." *Id.* at 0060.  OFAC acknowledged the delisting request by email the same day. *Id.* at 0434.  In doing so, the agency noted that "the review process can be lengthy, and it is likely that OFAC will seek additional information from [Plaintiff] before a final determination is made[.]" *Id.*

On May 6, 2020, OFAC provided Plaintiff a request for additional information to better evaluate her petition. *Id.* at 0061-62.  OFAC specifically asked Plaintiff about eight categories of

information, including contacts with and the provision of support to Radovan Karadzic.  *Id.*  OFAC also emphasized that "any false or misleading information provided by you may result in the delay and/or denial of the final determination of your request for reconsideration."  *Id.* at 0062.

Plaintiff responded by letter dated May 28, 2020, denying that she assisted Radovan Karadzic or had contact with him between February 1998 and July 2008.  *Id.* at 0007, 0066-67. Additionally, Plaintiff admitted to having contact with at least one individual indicted for war crimes or by the ICTY.  *Id.* at 0066.  OFAC requested additional and clarifying information from Plaintiff on August 28, 2020.  *Id.* at 0008, 0063-65.  She responded by letter dated September 20, 2020.  *Id.* at 0008, 0068-69.  Plaintiff, through counsel, continued to correspond with OFAC about the status of the petition.  *Id.* at 0436-79.

### C.      OFAC's Denial of Plaintiff's Petition

On October 20, 2023, OFAC denied Plaintiff's request for removal from the SDN List.  *Id.* at 0001-42.  The agency reached its decision "[a]fter reviewing and carefully considering the evidence available to OFAC, including classified information and materials [Plaintiff] submitted, as well as engaging in interagency consultation[.]"  *Id.* at 0001; *see id.* at 0010.  OFAC found that Plaintiff "continues to meet the criteria for designation pursuant to E.O. 13304" and "has not provided persuasive arguments or evidence establishing that an insufficient basis exists for her designation or that the circumstances resulting in her designation no longer apply."  *Id.* at 0001; *see id.* at 0010.  OFAC identified multiple grounds for its decision.[1]

Plaintiff Materially Assisted and Provided Support to Radovan Karadzic.  First, OFAC

---

[1] The information described here pertains to unclassified information only.  As OFAC's decision was based in part on classified information, Defendants intend to lodge with the Court, on an *ex parte*, *in camera* basis, a copy of the unredacted record when the parties file the joint appendix required by Local Civil Rule 7(n).  *See* 50 U.S.C. § 1702(c).

determined that Plaintiff's continued inclusion on the SDN List was warranted because, "despite her denial of such activity[,]" Plaintiff "has materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services in support of, Radovan Karadzic, an individual listed in the Annex to E.O. 13304." *Id.* at 0001; *see id.* at 0010-21; *see also* EO 13304, § 3(a) (amending EO 13219, § 1(a)(ii)(D)). In reaching this conclusion, OFAC considered "multiple, credible sources of information available to" the agency, which indicate that Plaintiff provided such assistance and support to Radovan Karadzic while he was in hiding after his 1995 indictment by the ICTY. AR at 0010-21. For instance, OFAC relied on the factual findings of the European Union that Plaintiff "help[ed] [Radovan Karadzic]" "get support," "find a hiding place," and "acted as a part of the network enabling connections with other members of [Radovan Karadzic's] family." *Id.* at 011 (quoting AR at 0195). Similarly, OFAC based its decision on information that in 2003, the High Representative to Bosnia and Herzegovina "signed a decision to freeze the bank accounts . . . of 14 people," including Plaintiff, "who [are] helping indicted war criminals evade arrest[.]" *Id.* at 0010 (quoting press statement issued by the High Representative); *see id.* at 0001, 0097. Reporting from BBC News further indicated that in freezing Plaintiff's accounts, the High Representative considered Plaintiff to be among Radovan Karadzic's support network. *Id.* at 0001, 0010, 0097-100; *see id.* at 0100 (quoting statement from the High Representative that "[i]t makes things harder for Mr [Radovan] Karadzic to move around when his supporters are financial outlaws").

In finding that Plaintiff materially assisted and provided support to Radovan Karadzic, OFAC additionally relied on information regarding the international community's efforts to arrest her husband. For instance, in November 2007, "EU peacekeepers launched a dawn raid" on the home of Plaintiff, who was "believed to be associated with a support network for [Radovan

Karadzic].”  *Id.* at 0011; *see id.* at 0149-50; *see also id.* at 0011-12 (describing open-source reporting regarding other raids on Plaintiff's home, as well as additional restrictions placed on Plaintiff for her “role in the support network of [Radovan Karadzic]”).[2]

Finally, OFAC referenced both unclassified and classified reporting that Plaintiff maintained contact with Radovan Karadzic after his indictment by the ICTY.  *Id.* at 0001-02, 0017-21.  Plaintiff herself acknowledged in multiple media interviews that she met with Radovan Karadzic while he was in hiding.  *Id.* at 0017-18; *see id.* at 0075 (admitting that Plaintiff saw Radovan Karadzic in 2001), *id.* at 0161 (same), *id.* at 0275 (“We were able to meet more often during the first few years.”), *id.* at 0301 (stating, in September 1999, that “[p]erhaps he has grown old a little, which I cannot tell, as I see him too often to tell”).  Additional open-source reporting confirms these statements.  *Id.* at 0018-19; *see id.* at 0152 (May 5, 2009 article in *The Guardian* stating that Radovan Karadzic “was reportedly seen having lunch with his wife, Ljiljana, in a restaurant in south-eastern Bosnia on April 14”), *id.* at 0200 (Mar. 21, 2008 article in daily Sarajevo-based newspaper stating that intercepted letters between Radovan Karadzic and Plaintiff “show that the two had met in Radovan’s hideout even before their 2002-2004 meetings in Belgrade”).  The evidence before the agency also indicated that Radovan Karadzic and Plaintiff maintained contact through written correspondence.  *Id.* at 0019, 0283, 0391; *see id.* at 0019, 0422, 0424 (referencing testimony that witness corresponded with Radovan Karadzic via Plaintiff).  OFAC assessed that this information about Plaintiff's contacts with Radovan Karadzic “increases the likelihood that [Plaintiff] provided support to [him.]”  *Id.* at 0017.

<u>Plaintiff Actively Obstructed or Poses a Significant Risk of Actively Obstructing the</u>

---

[2] The agency determined that Plaintiff “maintained influence over at least one entity associated with providing support to Radovan Karadzic.”  *Id.* at 0001.  Defendants refer the Court to pages 0012-17 and the cited exhibits of the classified record for information regarding this finding.

<u>Dayton Accords or the Conclusions of the Peace Implementation Conference.</u>  In addition to denying Plaintiff's petition on the ground that she materially assisted and provided support to Radovan Karadzic, OFAC also determined that removal from the SDN List was not warranted because Plaintiff "actively obstructed or poses a significant risk of actively obstructing the Dayton Accords or the Conclusions of the Peace Implementation Conference held in London on December 8-9, 1995, including the decisions or conclusions of the High Representative, the Peace Implementation Council or its Steering Board, relating to [Bosnia and Herzegovina]."  *Id.* at 0021; *see id.* at 0002, 0021-26; *see also* EO 13304, § 3(a) (amending EO 13219, § 1(a)(ii)(C)).

First, the information available to OFAC described Plaintiff's "attendance at public events glorifying [Radovan Karadzic's] crimes and legacy[.]"  AR at 0021.  In November 2018, Plaintiff attended a rally held by a political candidate who "told supporters that as RS President he would model himself after [Radovan Karadzic]" and who spoke directly to Plaintiff in lionizing the war criminal.  *Id.* at 0002, 0021-22, 0408, 0421.  Two years earlier, Plaintiff attended the opening of a student dormitory named after Radovan Karadzic.  *Id.* at 0002, 0023, 0344-45.  She was joined by (and photographed with) the Serb Republic national President and SDN Milorad Dodik, who questioned the impartiality of the ICTY.  *Id.*

Second, OFAC relied on reporting that Plaintiff publicly defended the crimes for which Radovan Karadzic was indicted and promoted alternative narratives related to the atrocities committed during the Bosnian war.  *Id.* at 0021.  Such reporting included an open-source article quoting Plaintiff as stating that "[i]f the statehood of the Serb Republic has been won [as a result of Radovan Karadzic's presidency], at least in some elements, then that is a tremendous success."  *Id.* at 0022, 0303.  Plaintiff also denied that her husband was guilty of war crimes and instead "did all he could to avoid people suffering during the conflict."  *Id.* at 0022, 0158; *see id.* at 0023, 0203.

11

Plaintiff similarly suggested in an interview that other groups bore as much responsibility for the conflict as the Serbs led by her husband.  *Id.* at 0023, 0276.

Third, reporting demonstrated that Plaintiff was "unwilling[] to fully cooperate with the ICTY's efforts to apprehend [Radovan Karadzic]."  *Id.* at 0021.  She defiantly stated in April 1998 that Radovan Karadzic "will never turn himself in voluntarily, and he will resist any eventual attempt to arrest him, capture him or illegally detain him."  *Id.* at 0159; *see id.* at 0022.  Plaintiff made comparable statements in 2002 and 2004.  *Id.* at 0022, 0206 (asserting that "no one from his family has any intention to work on his surrender"); *id.* at 0023, 0182 (declaring that she would not disclose Radovan Karadzic's location to NATO and a Bosnian Serb agency).

Fourth, the agency's sources established that Plaintiff publicly cast doubt on the ICTY's legitimacy.  *Id.* at 0002, 0021.  She characterized the tribunal as "illegal," *id.* at 0022, 0206, and as a "malignant cancer spread in a legal tissue of countries supporting its work[,]" *id.* at 0023, 0162.  OFAC also concluded that Plaintiff was complicit in the remarks by Milorad Dodik that similarly disparaged the ICTY.  *Id.* at 0024.[3]

In OFAC's view, this evidence supported a finding that designation was warranted under EO 13219, § 1(a)(ii)(C), as amended by EO 13304.  *Id.* at 0024-25.  As OFAC explained, Plaintiff's conduct was inconsistent with the High Representative's warning that the ICTY's final verdict against Radovan Karadzic "must be fully respected and not politicized."  *Id.* at 0024; *see id.* at 0024-25, 0318.  OFAC additionally found relevant to its analysis the prominence of Plaintiff

---

[3] OFAC acknowledged that, in July 2005, Plaintiff reportedly called for Radovan Karadzic to surrender to the ICTY.  *Id.* at 0002, 0025-26.  However, OFAC concluded that this plea was not sufficient to warrant delisting, because it "was driven by the enduring cost and hardships on the[] family of [Radovan Karadzic's] continued evasion of the law, and not a change in her views of the ICTY's legitimacy or [Radovan Karadzic's] innocence."  *Id.* at 0026.  OFAC also explained that her "isolated plea in no way counteracts the plethora of public statements she made defending [Radovan Karadzic] and condemning the ICTY[.]"  *Id.*

in Bosnia and Herzegovina, "particularly on the matter of her husband's time in hiding, trial, and conviction."  *Id.* at 0024.  The agency further assessed that evidence regarding Plaintiff's material assistance and provision of support to Radovan Karadzic shows that Plaintiff meets the criteria for designation pursuant to EO 13219, § 1(a)(ii)(C), as amended by EO 13304.  *Id.* at 0025; *see id.* at 0102 (statement by High Representative that the assistance of war criminals obstructs the General Framework for Peace in Bosnia and Herzegovina).

In Foreign Policy Guidance, the Department of State Recommends that OFAC Maintain Plaintiff's Designation.  In evaluating whether to grant Plaintiff's request for removal from the SDN List, OFAC considered the foreign policy views of the Department of State.  *Id.* at 0003, 0026-32, 0332-42.  The Department of State recommended against delisting "due to [Plaintiff's] failure to disavow her husband's genocidal actions, her assistance to Radovan Karadzic's efforts to evade justice, her continued support of Karadzic and his political views, and the overwhelmingly negative implications of granting the petition for U.S. foreign policy and stability in the Western Balkans region."  *Id.* at 0332.  The Department of State also expressed concern that removing Plaintiff from the SDN List "would undermine the U.S. commitment to ensuring accountability for genocide and embolden a range of actors who invoke Karadzic's legacy in their own campaigns that promote ethnic violence in the Balkans and around the world."  *Id.*

Plaintiff Provided False or Misleading Information to OFAC.  As noted above, OFAC warned Plaintiff at the outset of the administrative process that providing "any false or misleading information . . . may result in the delay and/or denial of the final determination of your request for reconsideration."  *Id.* at 0062.  Nonetheless, in response to OFAC's questionnaire, Plaintiff represented that "[m]y contacts with my husband Radovan Karadzic continued until around February 1998, when he went into hiding.  I did not have any contact with him between that time

and the time of his arrest in July 2008." *Id.* at 0066. The evidence available to OFAC—including Plaintiff's own statements to multiple media outlets—readily refutes this self-serving assertion. *Id.* at 0017-21. OFAC thus determined that Plaintiff's false or misleading submissions "suppl[y] an independent basis to deny her petition." *Id.* at 0033; *see id.* at 0002, 0017.

OFAC Addresses and Rejects the Arguments Advanced by Plaintiff. OFAC concluded by addressing the remaining arguments raised by Plaintiff in her petition. *Id.* at 0033-34. First, OFAC rejected as irrelevant Plaintiff's assertion that she has never been charged with any crime related to the war in the former Yugoslavia or the activities of her husband. *Id.* at 0033; *see id.* at 0059-60. As OFAC explained, "designation pursuant to E.O. 13304 does not require an arrest, indictment, or conviction by a foreign body," but instead is based on whether Plaintiff materially assisted or supported a SDN designated under EO 13304, or whether Plaintiff actively obstructed or poses a significant risk of actively obstructing, among other things, the Dayton Accords. *Id.* at 0033. Second, OFAC disagreed that Plaintiff had demonstrated a change of circumstances sufficient to warrant her removal from the SDN List. *Id.* at 0033-34; *see id.* at 0060. OFAC acknowledged that Radovan Karadzic had been apprehended in 2008. *Id.* at 0033. However, given Plaintiff's conduct, the agency concluded that Plaintiff continued to meet the criteria for designation under both § 1(a)(ii)(D) and § 1(a)(ii)(C) of EO 13219, as amended, for the reasons described above. *Id.* Accordingly, OFAC denied Plaintiff's petition. *Id.* at 0001-03, 0034.

**D.    Plaintiff's Amended Complaint**

Plaintiff filed this lawsuit on May 2, 2023, Compl. ¶¶ 2-3, ECF No. 1, and amended her Complaint on November 11, 2023, Am. Compl.[4] Plaintiff claims that OFAC unreasonably delayed

---

[4] The Complaint included as plaintiffs Sonja Karadzic Jovicevic and Aleksandar Karadzic, who had similarly petitioned OFAC for removal from the SDN List. Compl. ¶ 12. After OFAC denied

its decision on her request for removal from the SDN List, in violation of § 706(1) of the APA. *Id.* ¶¶ 42-45 (Count I).  Plaintiff next asserts that the agency's decision to deny her petition is arbitrary and capricious and should be set aside pursuant to § 706(2) of the APA.  *Id.* ¶¶ 46-48 (Count II).  Third and finally, Plaintiff brings a stand-alone claim for attorney's fees under the Equal Access to Justice Act, 28 U.S.C. § 2412 ("EAJA").  *Id.* ¶¶ 49-53 (Count III).

## LEGAL STANDARDS OF REVIEW

On a motion to dismiss under Rule 12(b)(1), the plaintiff bears the burden of establishing the court's subject-matter jurisdiction.  *Khadr v. United States*, 529 F.3d 1112, 1115 (D.C. Cir. 2008).  "Standing is a necessary predicate to any exercise of federal jurisdiction, and if it is lacking, then the dispute is not a proper case or controversy under Article III, and federal courts do not have subject matter jurisdiction to decide the case."  *Prisology v. Fed. Bureau of Prisons*, 74 F. Supp. 3d 88, 93 (D.D.C. 2014), *aff'd*, 852 F.3d 1114 (D.C. Cir. 2017).

A Rule 12(b)(6) motion tests whether a complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  While a complaint "does not need detailed factual allegations," it "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]" *Twombly*, 550 U.S. at 555.

Rule 12(d) authorizes a court to treat a Rule 12(b)(6) motion as a motion for summary judgment under Rule 56 where the defendants rely on matters outside the pleadings, provided that all parties have a reasonable opportunity to present all material pertinent to the motion.  Fed. R.

---

Sonja Karadzic Jovicevic's petition and granted Aleksandar Karadzic's petition, those individuals decided to withdraw from this lawsuit.  Resp. to Notification of Pls.' Petitions at 1, ECF No. 10; *see* Mem. of P. & A. in Supp. of Pl.'s Mot. for Summ. J. at 16, ECF No. 16-1 ("Pl.'s Mem.").

Civ. P. 12(d).  Under Rule 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In the context of an APA claim, "[s]ummary judgment . . . serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review."  *Zevallos v. Obama*, 10 F. Supp. 3d 111, 117 (D.D.C. 2014) (quoting *Kadi v. Geithner*, 42 F. Supp. 3d 1, 9 (D.D.C. 2012)), *aff'd*, 793 F.3d 106 (D.C. Cir. 2015).

## DISCUSSION

### I.      Plaintiff's Unreasonable Delay Claim Fails

#### A.      Plaintiff's Claim is Moot

Count I of Plaintiff's Amended Complaint is premised on the lack of a decision by OFAC regarding her administrative petition for removal from the SDN List.  Am. Compl. ¶¶ 43-45.  In connection with this claim, Plaintiff asks that the Court "[d]eclare the delay in adjudicating her requests to be removed from the SDN List to have been unreasonable[.]"  *Id.* ¶ 54(a).

This claim is moot.  Pursuant to Article III of the Constitution, "Federal courts are authorized to adjudicate only 'actual, ongoing controversies' that are within the jurisdiction of the court."  *NTCH, Inc. v. FCC*, 841 F.3d 497, 504 (D.C. Cir. 2016) (quoting *Honig v. Doe*, 484 U.S. 305, 317 (1988)).  "A live controversy must exist at all stages of judicial review, not only when a complaint is filed."  *Id.*  "If events outrun the controversy such that the court can grant no meaningful relief, the [claim] must be dismissed as moot."  *Id.* (citation omitted).  As discussed above, OFAC has now issued its decision on Plaintiff's request for reconsideration.  AR at 0001-03.  While Plaintiff did not receive "the result [she] hoped for, it is still a decision."  *Zevallos*, 10 F. Supp. 3d at 123 (dismissing § 706(1) claim where OFAC denied petition nearly three months

16

after the plaintiff filed the complaint); *see Pejcic*, 2021 WL 1209299, at *4; *Olenga v. Gacki*, 507 F. Supp. 3d 260, 279 (D.D.C. 2020).  The Court can therefore award no relief under Plaintiff's unreasonable delay claim beyond that already provided by OFAC.  *Zevallos*, 10 F. Supp. 3d at 123 ("All this Court can do is 'compel agency action . . . unreasonably delayed,' i.e., compel OFAC to issue *a* decision—which it has already done.") (quoting 5 U.S.C. § 706(1)).[5]  Accordingly, Count I must be dismissed for lack of subject-matter jurisdiction.

Perhaps sensing the limits of her unreasonable delay claim, Plaintiff attempts to invoke one of the few exceptions to the mootness doctrine, where the challenged conduct is capable of repetition yet evading review.  Am. Compl. ¶ 37.  That exception does not apply here.

First, to be capable of repetition, there must be "a reasonable expectation that the same complaining party would be subjected to the same action again."  *Weinstein v. Bradford*, 423 U.S. 147, 149 (1975) (per curiam).  To meet this test, a plaintiff must show "not merely a 'physical or theoretical possibility' of recurrence, but a 'reasonable expectation' if not a 'demonstrated probability' that [he or she] will be subject to the same action."  *Pub. Utils. Comm'n of Cal. v. FERC*, 236 F.3d 708, 714 (D.C. Cir. 2001) (citations omitted).  Plaintiff can only speculate about additional administrative proceedings before OFAC, the outcome of those proceedings, and how long those proceedings will take.[6]  There is therefore no reason to conclude that the agency would

---

[5] For this reason, Plaintiff's belated request that the Court "remove [her] from the sanctions list as a remedy for [OFAC's] unreasonable delay" is entirely improper (and beyond the scope of the relief requested in the Amended Complaint).  Pl.'s Mem. at 38; *see* Am. Compl. ¶ 45.

[6] *Reid v. Hurwitz*, 920 F.3d 828 (D.C. Cir. 2019), cited in Pl.'s Mem. at 30-31, is inapposite.  In that case, the D.C. Circuit held that the district court erred in dismissing on mootness grounds, because the plaintiff "identifies not only single instances but also BOP's alleged policy or practice of violating its own regulations to the detriment of [the plaintiff]."  *Id.* at 834; *see id.* (emphasizing the plaintiff's "claim that he was repeatedly subjected to deprivations in the SHU due to an ongoing policy or practice of the BOP").  Plaintiff here, who has utilized OFAC's procedures only once, can make no similar allegations of repeated violations to her detriment.

unreasonably delay in evaluating an as-yet unfiled delisting petition.  *Pejcic*, 2021 WL 1209299, at *5-6 ("In the absence of well pleaded facts or cognizable evidence that Pejcic will submit another delisting petition and be subjected to OFAC's unreasonable delay on that petition, Pejcic has failed to meet his burden to establish the issue is capable of repetition, yet evading review, and his claim under 5 U.S.C. § 706(1) is moot.").

Second, to evade review, the challenged action must be "in its duration too short to be fully litigated" to the Supreme Court "prior to its cessation or expiration."  *Newdow v. Roberts*, 603 F.3d 1002, 1008 (D.C. Cir. 2010) (quoting *Weinstein*, 423 U.S. at 149).  Although "agency actions of less than two years' duration" generally "cannot be 'fully litigated' prior to cessation or expiration," that rule of thumb applies only "so long as the short duration is typical of the challenged action."  *Del Monte Fresh Produce Co. v. United States*, 570 F.3d 316, 322 (D.C. Cir. 2009) (citation omitted).[7]  Plaintiff has not demonstrated that is the case here; indeed, Plaintiff emphasizes that OFAC's decision-making process exceeded two years.  Am. Compl. ¶¶ 29, 33.  Nor has Plaintiff asserted how long it typically takes for OFAC to decide delisting petitions.  *Cf. Grant v. Vilsack*, 892 F. Supp. 2d 252, 257 (D.D.C. 2012).  Plaintiff also incorrectly frames the inquiry in terms of "[t]he reasonable time in which OFAC would be expected to decide a delisting

---

[7] In *Del Monte*, the plaintiff challenged OFAC's delay in issuing a one-year export license for commodities.  570 F.3d at 318-20.  OFAC had established an expedited process whereby the agency would grant the license within nine business days, assuming the application satisfied regulatory requirements and other agencies did not object.  *Id*. at 319-20.  OFAC, however, did not issue the license after the inter-agency referral, even though more than 100 days had elapsed and no other agency objected, and the plaintiff brought suit under § 706(1).  *Id*. at 320.  The D.C. Circuit reversed the district court's finding that the case was moot, holding that the claim was capable of repetition yet evading review.  *Id*. at 320-21.  But unlike in *Del Monte*, here there are no regulatory deadlines that govern OFAC's consideration of delisting petitions.  *See* 31 C.F.R. § 501.807.  Further, the time expended by OFAC in deciding such petitions far exceeds the nine-day window at issue in *Del Monte*.  And whereas in *Del Monte* OFAC announced that it expected future delays in deciding licensing applications, 570 F.3d at 324, Plaintiff here can point to no similar assertion by OFAC, *see Pejcic*, 2021 WL 1209299, at *6 (distinguishing *Del Monte*).

application." Pl.'s Mem. at 28.

Additionally, in order to invoke this exception to mootness, "a plaintiff [must] make a full attempt to prevent [her] case from becoming moot, an obligation that includes filing for preliminary injunctions and appealing denials of preliminary injunctions." *Newdow*, 603 F.3d at 1009; *see People for the Ethical Treatment of Animals, Inc. v. U.S. Fish & Wildlife Serv.*, 59 F. Supp. 3d 91, 98 (D.D.C. 2014). Having failed to move for preliminary relief or for expedited consideration of her claims, Plaintiff cannot now argue that Count I has evaded review. *See Newdow*, 603 F.3d at 1009-10.

Plaintiff similarly cannot advance her argument by alleging that "OFAC has engaged in a practice of unreasonably delaying its decisions on delisting requests, and to issue such decisions after the filing of complaints in this Court so as to evade review of its unreasonable delay in deciding delisting requests." Am. Compl. ¶ 34; *see Pejcic*, 2021 WL 1209299, at *6 n.3 ("To the extent Pejcic relies on OFAC's delay in adjudicating the delisting petitions of other sanctioned individuals to show a likelihood of repetition . . . that is insufficient because it does not demonstrate that 'the same complaining party will be subjected to the same action again[.]'" (quoting *Weinstein*, 423 U.S. at 149)). Further, while it is true that OFAC has on occasion decided delisting petitions after the filing of a lawsuit, *see* Am. Compl. ¶ 35; Pl.'s Mem. at 25, such limited anecdotal evidence is insufficient to establish an agency practice. Indeed, Plaintiff fails to mention that OFAC frequently makes delisting decisions in the absence of litigation. *See, e.g.*, Compl., ECF No. 1, *Nangaa Yobeluo v. Smith*, No. 1:21-cv-02973 (D.D.C. Nov. 10, 2021) (challenging previously issued denial of delisting petition); Compl., ECF No. 1, *Fulmen Co. v. OFAC*, No. 1:18-cv-2949 (D.D.C. Dec. 14, 2018) (same); Compl., ECF No. 1, *Sulemane v. Lew*, No. 1:16-cv-01822 (D.D.C. Sept. 12, 2016) (same); *see also* Appendix, attached hereto (providing numerous other

examples).   Additionally, individuals who have not availed themselves of the administrative reconsideration process have obtained judicial review of their initial designation.  *E.g.*, *Lopez Bello v. Smith*, 651 F. Supp. 3d 20, 26 (D.D.C. Dec. 21, 2022), *appeal filed*, No. 23-5036 (D.C. Cir. Feb. 21, 2023); *Rakhimov*, 2020 WL 1911561, at *1.  And the assertion that OFAC intentionally seeks to avoid judicial review of unreasonable delay claims, Am. Compl. ¶ 39, is inconsistent with the facts of this case.  As Plaintiff acknowledges, Pl.'s Mem. at 15, Defendants' Rule 12(b) motion to dismiss was fully briefed and ripe for adjudication months before they issued a final decision on her petition.

Plaintiff's theory is also legally deficient.  First, it is contrary to "the well established presumption that public officials . . . act in good faith and are conscientiously proper in the discharge of their duties."  *Beyond Pesticides/Nat'l Coal. Against the Misuse of Pesticides v. Johnson*, 407 F. Supp. 2d 38, 41 (D.D.C. 2005) (citation omitted); *see Holy Land Found. for Relief & Dev. v. Ashcroft*, 219 F. Supp. 2d 57, 65-66 (D.D.C. 2002), *aff'd*, 333 F.3d 156 (D.C. Cir. 2003). Second, Plaintiff does not assert a separate and independent cause of action related to this alleged agency practice of delay.  *See* Am. Compl. ¶¶ 42-53.  Rather, she invokes this alleged practice to support "the merits of [her] delay claim," *Pejcic*, 2021 WL 1209299, at *5 n.2, including her request for declaratory relief, Am. Compl. ¶ 54(a).  However, "if a plaintiff has made no challenge to some ongoing underlying policy, but merely attacks an isolated agency action, then the mooting of the specific claim moots any claim for a declaratory judgment that the specific action was unlawful, unless the specific claim fits the exception for cases that are 'capable of repetition, yet evading review[.]'"  *City of Houston v. Dep't of Hous. & Urb. Dev.*, 24 F.3d 1421, 1429 (D.C. Cir. 1994) (quoting *Roe v. Wade*, 410 U.S. 113, 124-25 (1973)); *cf. Spencer v. Kemna*, 523 U.S. 1, 18 (1998) (warning against granting declaratory relief based on past actions that lack continuing

effect); *Action All. of Senior Citizens of Greater Phila. v. Heckler*, 789 F.2d 931, 943 n.15 (D.C. Cir. 1986) (similar).  Because that exception does not apply for the reasons discussed, and because Plaintiff's Amended Complaint centers on isolated agency action, her claim fails.

To the extent that Plaintiff contends that the requested declaratory relief would be effective because it would "allow [her] to have any future requests for delisting decided without unreasonable delay," Pl.'s Mem. at 27, she is mistaken.  The declaration requested is a limited, retrospective one and would not be effective with respect to any hypothetical future petition filed by Plaintiff, nor with respect to OFAC's sanctions program generally.  *See Ashcroft v. Mattis*, 431 U.S. 171, 172 (1977) (per curiam).  The circumstances that might render OFAC's adjudications "unreasonably delayed" are case-specific and would differ from the circumstances that might arise in a hypothetical future adjudication.  *See id.*; *see also Pub. Serv. Comm'n of Utah v. Wycoff Co.*, 344 U.S. 237, 246 (1952) ("[T]he declaratory judgment procedure will not be used to preempt and prejudice issues that are committed for initial decision to an administrative body or special tribunal any more than it will be used as a substitute for statutory methods of review."); *cf. Ass'n of Am. Med. Colls. v. United States*, 217 F.3d 770, 779-80 (9th Cir. 2000).  Similarly, Plaintiff's desire to recover attorney's fees, *see* Pl.'s Mem. at 27, is not a basis to obtain declaratory relief; if Plaintiff cannot show an entitlement to a declaratory judgment on the merits, she cannot be entitled to such a judgment solely as a basis to recover fees.  *See SecurityPoint Holdings, Inc. v. TSA*, 836 F.3d 32, 36 (D.C. Cir. 2016) (discussing tripartite test for determining entitlement to EAJA fees).

Dismissal would still be warranted even if Plaintiff sought to challenge an ongoing policy and obtain declaratory relief.  In such a challenge, she must demonstrate both standing and ripeness.  *Del Monte*, 570 F.3d at 322; *see City of Houston*, 24 F.3d at 1430.  Contrary to her conclusory assertions, Am. Compl. ¶¶ 36, 38; Pl.'s Mem. at 29, Plaintiff lacks standing to bring

such a claim, as she can only speculate about the timing and results of OFAC's future decision-making in connection with an as-yet-unfiled petition. *Pejcic*, 2021 WL 1209299, at *5; *see Williams v. Lew*, 819 F.3d 466, 472 (D.C. Cir. 2016) ("[W]here a plaintiff 'seeks prospective declaratory and injunctive relief, he must establish an ongoing or future injury that is certainly impending; he may not rest on past injury.'" (citation omitted)).  The declaration from Plaintiff's counsel—stating that, if this Court does not grant summary judgment in favor of Plaintiff, he will file another delisting petition on her behalf, Decl. of Peter Robinson ¶ 9, ECF No. 16-2—does not shore up this deficiency. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564 (1992) ("Such 'some day' intentions" do not demonstrate injury for standing purposes.).  Moreover, the intent to file a petition is not sufficient; Plaintiff must also show that she will be "subjected to OFAC's unreasonable delay on that petition." *Pejcic*, 2021 WL 1209299, at *6.

For similar reasons, such a claim would be unripe.  A challenge to OFAC's alleged practice is not fit for review, particularly given the "speculative possibility" that Plaintiff will be subject to future delay, *Conservation Force, Inc. v. Jewell*, 733 F.3d 1200, 1206-07 (D.C. Cir. 2013), and Plaintiff's failure to demonstrate that a policy of delay actually exists, *City of Houston*, 24 F.3d at 1431; *see People for the Ethical Treatment of Animals*, 59 F. Supp. 3d at 98-99.  As to hardship, Plaintiff does not have "an outstanding [delisting petition] that is presently being delayed[,] [n]or . . . a concrete plan to apply for [delisting] in the future." *Conservation Force*, 733 F.3d at 1206-07.  And Plaintiff's nearly 17-year delay in requesting removal from the SDN List indicates that she lacks an "interest in immediate review." *City of Houston*, 24 F.3d at 1431 (citation omitted).

## B.     The Court Otherwise Lacks Jurisdiction over Count I

Even if Plaintiff's unreasonable delay claim presents a live controversy—and it does not—the Court should nonetheless dismiss that claim for lack of jurisdiction.  The APA places strict

limits on judicial review of alleged agency inaction.  Because the APA "carried forward" the common law writ of mandamus in § 706(1), the mandamus standards also apply to an APA claim of unreasonable delay.  *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 63 (2004) ("*SUWA*").  "To show entitlement to mandamus, plaintiffs must demonstrate (1) a clear and indisputable right to relief, (2) that the government agency or official is violating a clear duty to act, and (3) that no adequate alternative remedy exists."  *Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183, 189 (D.C. Cir. 2016); *see SUWA*, 542 U.S. at 64 ("[A] claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*.").  "These three threshold requirements are jurisdictional."  *Am. Hosp. Ass'n*, 812 F.3d at 189.

Plaintiff here cannot identify a "specific, unequivocal command" concerning the timing of OFAC's decisions on delisting petitions.  *SUWA*, 542 U.S. at 63 (citation omitted).  To the contrary, IEEPA and EO 13304 collectively confer upon OFAC broad discretion to make determinations concerning designations of war criminals and their supporters.  *See Fulmen Co. v. OFAC*, 547 F. Supp. 3d 13, 26 (D.D.C. 2020); *see also Wilbur v. U.S. ex rel. Kadrie*, 281 U.S. 206, 220 (1930) ("Mandamus has never been regarded as the proper writ to control the judgment and discretion of an officer as to the decision of a matter which the law gave him the power and imposed upon him the duty to decide for himself."); *cf. Sulemane v. Mnuchin*, Civ. A. No. 16-1822 (TJK), 2019 WL 77428, at *8 (D.D.C. Jan. 2, 2019).  Augmenting that broad grant of discretion is § 1704 of IEEPA, which expressly delegates to the President the authority to "issue such regulations . . . as may be necessary for the exercise of the authorities granted by this chapter."  50 U.S.C. § 1704; *see Nat. Res. Def. Council, Inc. v. Sec. & Exch. Comm'n*, 606 F.2d 1031, 1050 (D.C. Cir. 1979) ("The degree of discretion accorded the Commission is evident from the language in the various statutory grants of rulemaking authority.").  Similarly, while 31 C.F.R. § 501.807

23

establishes the procedures governing delisting petitions, it does not provide a period of time within which OFAC must decide such petitions. *See* 31 C.F.R. § 501.807.

In the absence of such a deadline, and given the complex national security and foreign policy implications of OFAC's discretionary decision-making, Plaintiff has failed to demonstrate the Court's jurisdiction to review her unreasonable delay claim. *See Karam v. Garland*, Civ. A. No. 21-0915 (CKK), 2022 WL 4598626, at *8 (D.D.C. Sept. 30, 2022) ("Based on the Court's conclusion that the 'pace of adjudication' is discretionary, neither the APA nor the Mandamus Act provides a basis for this Court to assert jurisdiction over Plaintiff's unreasonable delay claim."); *Beshir v. Holder*, 10 F. Supp. 3d 165, 172, 177 (D.D.C. 2014) (similar, and explaining that "[t]he national security considerations implicated by the adjudication of an adjustment application placed on hold because of terrorist-related inadmissibility further support the conclusion that the pace of adjudication is discretionary and thus not subject to judicial review"); *Orlov v. Howard*, 523 F. Supp. 2d 30, 37 (D.D.C. 2007) ("Here, there are no statutory guidelines compelling USCIS to adjudicate adjustment of status applications within a certain period of time. Thus, plaintiff plainly cannot assert that USCIS has failed to adjudicate his application within a time period in which it was *required* to do so."). Sanctions-related decisions lie at "the intersection of national security, foreign policy, and administrative law[,]" *Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 734 (D.C. Cir. 2007), and "involve significant political ramifications[,]" *Holy Land Found.*, 219 F. Supp. 2d at 74 n.28. A delisting petition, for example, may raise issues of whether a SDN "pose[s] a significant risk of committing . . . acts of terrorism[,]" Modernizing Sanctions to Combat Terrorism, Exec. Order 13886, § 1(a)(ii)(A), 84 Fed. Reg. 48,041, 48,041 (Sept. 9, 2019), or, as relevant here, has materially assisted a war criminal or "pose[s] a significant risk of actively obstructing" various international agreements, EO 13304, § 3(a). To adequately evaluate delisting

petitions, OFAC must assess the veracity of the information submitted by SDNs, as well as other reporting regarding their conduct.  *See, e.g.*, AR at 0068 (statement by Plaintiff that she never provided support to husband and war criminal Radovan Karadzic during his time in hiding, and that she did not have contact with Radovan Karadzic between February 1998 and July 2008). OFAC tests such statements by considering both unclassified and classified evidence.  *Id.* at 0001-42; *Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 162 (D.C. Cir. 2003) ("[I]t is clear that the government may decide to designate an entity based on a broad range of evidence, including intelligence data and hearsay declarations.").  That process can be time-consuming, AR at 0434 (noting that "the review process can be lengthy"), and requires significant expertise outside the purview of Plaintiff or a court, *cf. Holder v. Humanitarian L. Project*, 561 U.S. 1, 34 (2010) ("[W]hen it comes to collecting evidence and drawing factual inferences in this area, 'the lack of competence on the part of the courts is marked,' . . . and respect for the Government's conclusions is appropriate." (citation omitted)).

Additionally, OFAC considers the geopolitical ramifications of removing individuals and entities from the SDN List, a particularly sensitive undertaking here given the atrocities committed by Radovan Karadzic and the current instability in the Western Balkans.  *See* AR at 0332-42; *see also e.g.*, *Karadzic*, 602 F. Supp. 3d at 112; *Pejcic*, 2021 WL 1209299, at *8; *Olenga*, 507 F. Supp. 3d at 281-82.  Thus, just as the Judiciary may not compel the Executive Branch to reach a particular foreign policy or national security determination, *e.g.*, *Jesner v. Arab Bank, PLC*, 584 U.S. ---, 138 S. Ct. 1386, 1403 (2018), neither may the Judiciary dictate the timing of such determinations, *Holy Land Found.*, 219 F. Supp. 2d at 74 n.28 ("defer[ring] to the Executive's discretion on the timing of those foreign policy and national security decisions" about when to designate an entity as a terrorist).  Delisting decisions, in other words, are "[q]uite unlike a specific statutory command

requiring an agency to promulgate regulations by a certain date." *SUWA*, 542 U.S. at 71; *cf. Meina Xie v. Kerry*, 780 F.3d 405, 408 (D.C. Cir. 2015) (holding statutory provision "establishing a specific principle of temporal priority that clearly reins in the agency's discretion" entitled the plaintiff to relief under § 706(1)).

Finally, Plaintiff cannot establish the Court's jurisdiction by invoking 5 U.S.C. § 555(b). Am. Compl. ¶ 44. That subsection of the APA—which provides that, "[w]ith due regard for the convenience and necessity of the parties or their representatives and within a reasonable time, each agency shall proceed to conclude a matter presented to it"—is not a basis for relief under § 706(1), and in any event, "the general directive of [§] 555(b) is a far cry from the 'discrete agency action' that courts require when issuing an order compelling agency action 'unlawfully withheld or unreasonably delayed.'" *Hi-Tech Pharmacal Co. v. U.S. Food & Drug Admin.*, 587 F. Supp. 2d 1, 9 (D.D.C. 2008) (quoting *SUWA*, 542 U.S. at 63).

### C.    OFAC Did Not Unreasonably Delay its Decision on Plaintiff's Petition

Moreover, Plaintiff's claim of unreasonable delay fails under the factors set forth in *Telecommunications Research & Action Center v. FCC*, 750 F.2d 70 (D.C. Cir. 1984) ("*TRAC*"). The D.C. Circuit identified six factors to guide a court's analysis:

> (1) the time agencies take to make decisions must be governed by a "rule of reason"; (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and (6) the court need not "find any impropriety lurking behind agency lassitude in order to hold that agency action is 'unreasonably delayed.'"

*Id.* at 79-80 (citations omitted). The first and second factors are often considered together, *Yacoub v. Blinken*, Civ. A. No. 21-cv-983 (TSC), 2022 WL 4598681, at *4 (D.D.C. Sept. 30, 2022), as are

the third and fifth factors, *id.* at *5.

### 1.    Factors One and Two

"The first *TRAC* factor is the most important and carries the most weight,"[8] while "[t]he second *TRAC* factor provides that the content of such a rule of reason may be found in a timetable or other indication in the enabling statute." *Id.* at *4 (cleaned up). As noted above, and as Plaintiff admits, Pl.'s Mem. at 22, IEEPA does not provide a timeframe for OFAC to adjudicate delisting petitions. To the contrary, it confers broad discretion upon the Executive Branch to make designation decisions, 50 U.S.C. § 1702; *Dames & Moore*, 453 U.S. at 677, and in fact does not expressly contemplate an administrative delisting process at all, *see* 50 U.S.C. § 1702.

Nor can Plaintiff otherwise offer a "rule of reason" for the Court to apply. *TRAC*, 750 F.2d at 80. "That issue cannot be decided in the abstract, by reference to some number of months or years beyond which agency inaction is presumed to be unlawful, but will depend in large part . . . upon the complexity of the task at hand, the significance (and permanence) of the outcome, and the resources available to the agency." *Mashpee Wampanoag Tribal Council, Inc. v. Norton*, 336 F.3d 1094, 1102 (D.C. Cir. 2003). To reiterate, OFAC's decisions implicate extremely sensitive issues of national security and foreign policy and require the collection and assessment of a broad range of information. Moreover, the delisting process involves extensive consultation with OFAC's inter-agency partners, *see* AR at 0332-42; *Fares v. Smith*, 901 F.3d 315, 320 (D.C. Cir. 2018); *Karadzic*, 602 F. Supp. 3d at 109—partners who, like OFAC, have limited resources that must be allocated to numerous other programs. In light of the deference accorded to the government in these matters, *Islamic Am. Relief Agency*, 477 F.3d at 734, courts should grant

---

[8] Plaintiff incorrectly discusses the first factor in terms of "the time the agency took to make the decision[.]" Pl.'s Mem. at 20 (citation omitted).

OFAC significant leeway in taking the requisite amount of time to resolve a delisting petition. Otherwise, an order requiring OFAC to adjudicate such petitions within a SDN's preferred timeframe may lead to hasty decisions based on an incomplete assessment of the facts, thereby jeopardizing the United States' compelling interests and risking irretrievable asset flight. *Cf. Zevallos v. Obama*, 793 F.3d 106, 116 (D.C. Cir. 2015); *Holy Land Found.*, 219 F. Supp. 2d at 77.

Precedent in the immigration context provides a helpful point of comparison. For instance, this Court concluded that the Department of State's alleged delay in assessing waiver applications—"between one-and-a-half and three-and-a-half years"—was not unreasonable in light of the "significant national security interests . . . and the compelling government interest in allowing the agency to balance its competing priorities as it sees fit[.]" *Yacoub*, 2022 WL 4598681, at *4-5 (citation omitted). That holding accords with other cases "generally [finding] that immigration delays in excess of five, six, seven years are unreasonable, while those between three to five years are often not unreasonable." *Milligan v. Pompeo*, 502 F. Supp. 3d 302, 318 (D.D.C. 2020) (citation omitted), *appeal dismissed sub nom. Milligan v. Blinken*, 2021 WL 4768119 (D.C. Cir. Sept. 21, 2021). The national security and foreign policy concerns presented by delisting petitions are even more acute than those presented by run-of-the-mill visa applications, since persons requesting removal from the SDN List have been deemed by the Executive Branch—including, as in this case, by the President himself—to warrant sanctions. Thus, even if Plaintiff's petition was pending between April 24, 2020, and October 20, 2023, *but see* Am. Compl. ¶ 19 (alleging Plaintiff continued to provide information to OFAC through September 2020), the first and second *TRAC* factors weigh heavily against a finding of unreasonable delay.

Plaintiff's arguments do not compel a different conclusion. This case is quite unlike the out-of-circuit decision in *KindHearts for Charitable Humanitarian Development, Inc. v. Geithner*,

647 F. Supp. 2d 857 (N.D. Ohio 2009), on which Plaintiff relies.  Pl.'s Mem. at 20.  While the district court in that case stated that "OFAC has engendered a delay of remarkable duration," *Kindhearts*, 647 F. Supp. 2d at 907, the delay at issue concerned not an adjudication of a pending delisting petition, but rather the notice to the U.S.-based charitable organization plaintiff about the reasons for its designation under OFAC's terrorism authorities.  Plaintiff here received prompt notice of the government's designation and delisting decisions, so the district court's concerns regarding the delay in *KindHearts* are inapplicable.

Nor can Plaintiff establish that the first *TRAC* factor weighs in her favor because "OFAC did not conduct any field work or interviews" and "[i]ts investigation consisted entirely of searching and analyzing open source material from the internet."  Pl.'s Mem. at 20 (comparing OFAC to a college student).  Such characterizations are not only inaccurate—OFAC's investigation plainly involved more than a few basic internet searches, *see* AR at 0001, 0010-34 (discussing numerous classified and unclassified sources and inter-agency consultations)—but coarsely overlook the national security and foreign policy implications of the agency's decision-making.  Additionally, Plaintiff's argument lacks any basis in law; she fails to cite a single case for the proposition that agencies conducting "field work or interviews," Pl.'s Mem. at 20, are entitled to more time to make decisions, and that assertion cannot be reconciled with the D.C. Circuit's reasoning that the first *TRAC* factor turns not simply on the agency's methods for gathering information but on the nature of the decision and the resources available to make that decision.  *Mashpee Wampanoag Tribal Council*, 336 F.3d at 1102.

Plaintiff also cannot persuasively rely on decades-old *dicta* from the First Circuit.  In *Kokajko v. FERC*, 837 F.2d 524 (1st Cir. 1988), cited in Pl.'s Mem. at 20-21, the court denied the plaintiff's petition for a writ of mandamus to compel agency action.  In doing so, the court noted

that "[b]ased on the materials submitted to us, for the most part, there appear to have been relatively few periods of any significant length of unexplained agency inaction during the course of proceedings." *Id.* at 526.  Even if the Court were to adopt this analysis in weighing the *TRAC* factors, Plaintiff has failed to demonstrate that OFAC's consideration of her petition involved a "significant length of unexplained agency action." *Id.*  Speculating about the timeline of the government's consideration (based on when documents were accessed) does not support Plaintiff's theory of when the agencies began or concluded their analysis, or when OFAC first engaged with the Department of State.  Pl.'s Mem. at 20-21 (citing AR at 0333-34, 0375).  Agency actions are entitled to a presumption of good faith, as noted above.  Similarly, the correspondence between OFAC and Plaintiff does not show that OFAC was ready to issue its decision in May 2022.  Pl.'s Mem. at 20 (citing AR at 0440).  To the contrary, during that time OFAC explained that it was "continu[ing] to work diligently towards issuing final decisions" and offered to provide updates to Plaintiff's counsel.  AR at 0438-40.

Plaintiff next argues that this Court can discern a rule of reason because "[o]ther delisting procedures take far less time to resolve." *See* Pl.'s Opp. at 21 (referring to the United Nation's "ISIL (Da'esh) and Al Qaeda sanctions regime").  But Plaintiff offers no basis to conclude that the time it takes an international organization to decide a delisting petition in the context of a foreign proceeding provides a rule of reason to govern OFAC's process, particularly as OFAC's decision-making is based on different criteria and evidence.  *Cf. Kadi*, 42 F. Supp. 3d at 13 (courts should be "reluctant to rely on the decisions of other countries based on information that likely differed from the administrative record compiled by and available to OFAC," as "these decisions may have been reached under different standards of proof or review, which further undermines any persuasiveness they would have"); *accord Fulmen Co.*, 547 F. Supp. 3d at 24-25.

Finally, Plaintiff claims that "[t]he absence of a deadline does not give an agency the right to postpone a decision indefinitely." Pl.'s Mem. at 22. Yet OFAC is not claiming such a right. Moreover, Plaintiff's reliance on *Cobell v. Norton*, 240 F.3d 1081, 1096 (D.C. Cir. 2001), is misplaced. Pl.'s Mem. at 22. In that case, "the federal government ha[d] been under an obligation to discharge the fiduciary duties owed to [Individual Indian Money] trust beneficiaries for decades." *Cobell*, 240 F.3d at 1095. No such obligations, longstanding or recent, exist here. Moreover, absent from *Cobell* were the types of national security and foreign policy considerations that are central to this case. *See id.* at 1095-96.

### 2. Factors Three and Five

As an initial matter, the fact that Plaintiff waited 17 years to request removal from the SDN List undercuts her theory that she has suffered significant harm because of OFAC's delay. Additionally, the types of harms she alleges, such as "loss of employment opportunities, being unable to open or maintain a bank account, being delayed when crossing international borders, and the stigma from being suspected of obstructing the Dayton Accords and harboring persons indicted by the ICTY[,]" Am. Compl. ¶ 40, "fall far short of those credited in other cases that, for example, pose a significant threat to physical health or safety." *Devani v. U.S. Citizenship & Immigr. Servs.*, No. 22-cv-01932 (DLF), 2023 WL 2913645, at *5 (D.D.C. Apr. 12, 2023); *see Am. Hosp. Ass'n*, 812 F.3d at 193 (recognizing impact on health and welfare where hospital's operations were jeopardized); *Da Costa v. Immigr. Inv. Program Off.*, 643 F. Supp. 3d 1, 15 (D.D.C. 2022) (noting that "residents fear for their lives" and their "access to drinking water, electricity, and other public services is substantially limited"), *aff'd*, 80 F.4th 330 (D.C. Cir. 2023). The same is true of Plaintiff's claim that she has "suffered harm from the prolonged uncertainty and anxiety stemming from OFAC's unreasonable delay in deciding her request[] for delisting." Am. Compl. ¶ 41; *see*

31

*Devani*, 2023 WL 2913645, at *5 (explaining that because "uncertainty [is] an inherent part of the immigration process[,]" it does not weigh in favor of finding unreasonable delay); *Telles v. Mayorkas*, Civ. A. No. 21-395 (TJK), 2022 WL 2713349, at *4 (D.D.C. July 13, 2022) (concluding that alleged "expense, stress, and uncertainty . . . are far from the allegations of health and welfare harm found in other cases in which courts have weighed these factors in a plaintiff's favor" (citations omitted)).  And difficulty in accessing the global financial system, *see* Am. Compl. ¶ 40, also does not favor relief here.  IEEPA authorizes restrictions on the ability of U.S. persons to transact with sanctioned individuals, and such restrictions promote U.S. foreign policy and national security objectives.  50 U.S.C. §§ 1701-1702.  A desire for these restrictions to end more quickly while OFAC is considering a petition does not weigh in Plaintiff's favor in the *TRAC* analysis.

Moreover, even if Plaintiff had alleged the types of harms that implicate health and human welfare under *TRAC*—and she has not—the Court's analysis must consider "others similarly-situated." *Tesfaye v. Blinken*, Civ. A. No. 22-411 (CKK), 2022 WL 4534863, at *10 (D.D.C. Sept. 28, 2022); *see Dastagir v. Blinken*, 557 F. Supp. 3d 160, 168 (D.D.C. 2021); *Xiaoda Liu v. Mayorkas*, 548 F. Supp. 3d 1, 5 (D.D.C. 2021).  Plaintiff sets forth no allegations that the harm she suffered is unique among SDNs.  And as explained in Part I.C.3, below, requiring OFAC to adjudicate a particular request for removal would simply move one SDN ahead of others who have submitted similar requests.  *See Dehghanighanatghestani v. Mesquita*, Civ. A. No. 22-2595 (CKK), 2022 WL 4379061, at *8 (D.D.C. Sept. 22, 2022); *Dastagir*, 557 F. Supp. 3d at 168.

Nor can Plaintiff persuasively argue that she has been prejudiced by any delay because she was "required . . . to initiate expensive litigation, pay the $400 filing fee, and incur costs for serving the summonses."  Pl.'s Mem. at 24.  Again, if such expenses were sufficient under *TRAC*, these factors would tilt in favor of every litigant, regardless of their individual circumstances or the

government action at issue.  Plaintiff cites no authority to support such a broad theory, and Defendants are aware of none.

### 3.    Factor Four

The fourth *TRAC* factor—"the effect of expediting delayed action on agency activities of a higher or competing priority[,]" *TRAC*, 750 F.2d at 80—carries significant weight, *Mashpee Wampanoag Tribal Council*, 336 F.3d at 1100 (noting when the fourth *TRAC* factor has weighed in an agency's favor, courts have "refused to grant relief, even though all the other factors considered in *TRAC* favored it").  That factor tilts heavily in Defendants' favor here, as Plaintiff suggests that her request for removal from the SDN List should have been moved ahead of those who are similarly waiting their turn but who happen not to be litigants in this case.  *See id.*; *see also In re Barr Lab'ys, Inc*., 930 F.2d 72, 75 (D.C. Cir. 1991); *Yacoub*, 2022 WL 4598681, at *5-6.  Plaintiff "offers no reason why she should have 'super-priority' over" others seeking delisting, and "[t]here is no suggestion that the Government has treated [Plaintiff] differently than other [SDNs] nor are there 'unique considerations' that warrant line-jumping."  *Dastagir*, 557 F. Supp. 3d at 167 (citations omitted).

Plaintiff likewise cannot establish that the Court has any basis to "reorder[] [OFAC's] priorities."  *In re Barr Labs.*, 930 F.2d at 76.  As the D.C. Circuit explained, "[t]he agency is in a unique—and authoritative—position to view its projects as a whole, estimate the prospects for each, and allocate its resources in the optimal way."  *Id.*  To reiterate, designation-related decisions implicate grave national security and foreign policy issues, including the recent terrorist attacks against Israeli civilians by Hamas, U.S. Dep't of the Treasury, *Treasury Targets Additional Sources of Support and Financing to Hamas* (Oct. 27, 2023), https://home.treasury.gov/news/press-releases/jy1845; the detention of U.S. nationals abroad, U.S.

Dep't of the Treasury, *Treasury Sanctions Officials of Iranian Intelligence Agency Responsible for Detention of U.S. Nationals in Iran* (Apr. 27, 2023), https://home.treasury.gov/news/press-releases/jy1444; and Russia's brutal war against Ukraine, U.S. Dep't of the Treasury, *Treasury Sanctions Facilitator for Attempted Arms Deals Between North Korea and Russia* (Mar. 30, 2023), https://home.treasury.gov/news/press-releases/jy1377.  Delisting decisions are no exception.  *E.g.*, U.S. Dep't of the Treasury, *Treasury Removes Sanctions Imposed on Turkish Ministries and Senior Officials Following Pause of Turkish Operations in Northeast Syria* (Oct. 23, 2019), https://home.treasury.gov/news/press-releases/sm801 (removing sanctions as a result of ceasefire).  "Due to its expertise, [OFAC] must be permitted flexibility in navigating th[ese] tough choices[.]"  *See Ctr. for Sci. in the Pub. Interest v. U.S. FDA*, 74 F. Supp. 3d 295, 305 (D.D.C. 2014).

Plaintiff argues that "[t]he administrative record in this case contains no evidence [her] delisting request was delayed due to the high volume of such requests or activities of a higher priority."  Pl.'s Mem. at 23.  But there is no reason the administrative record concerning her specific petition denial would include such information.  The APA provides for courts to review "the whole record or those parts of it cited by a party."  5 U.S.C. § 706.  As a general rule, "review is to be based on the full administrative record that was before the [agency] at the time [it] made [its] decision."  *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971).  That includes material that was "directly or indirectly considered by the . . . decisionmaker(s)."  *Pac. Shores Subdivision Cal. Water Dist. v. U.S. Army Corps of Eng'rs*, 448 F. Supp. 2d 1, 7 (D.D.C. 2006) (citation omitted).  But it does not include "every potentially relevant document existing within [the] agency," *id.*, nor "every scrap of paper that could or might have been created," *TOMAC v. Norton*, 193 F. Supp. 2d 182, 195 (D.D.C. 2002), *aff'd sub. nom. TOMAC, Taxpayers of Mich. Against Casinos v. Norton*, 433 F.3d 852 (D.C. Cir. 2006).  Thus the administrative record

related to OFAC's denial of Plaintiff's delisting petition appropriately includes the information directly or indirectly considered in making that decision—not an analysis of competing demands on the agency's resources.

Plaintiff cannot claim that the fourth *TRAC* factor weighs in her favor because declaratory relief "would provide valuable guidance" to the agency.  Pl.'s Mem. at 23.  Plaintiff's argument—which concedes that such relief would have no effect on the parties and is based on a desire for the Court to issue an advisory opinion—only highlights the fact that her claim is moot.  Further, *In re Public Employees for Environmental Responsibility*, 957 F.3d 267, 275 (D.C. Cir. 2020), cited in Pl.'s Mem. at 24, is inapposite, as the court in that case did not simply issue a declaratory judgment.

### 4.    Factor Six

"[T]he sixth *TRAC* factor allows the Court to weigh any alleged impropriety against the other factors in the test."  *Beyond Pesticides*, 407 F. Supp. 2d at 41; *see Chowdhury v. Blinken*, Case No. 1:21-cv-1205-RCL, 2022 WL 136795, at *5 (D.D.C. Jan. 14, 2022) ("[T]he mere fact of a delay is insufficient to show impropriety.").  Plaintiff here does not directly allege any bad faith by OFAC with respect to deciding her request for reconsideration.  *See* Pl.'s Mem. at 24-26.  Rather, she claims that "[t]he Court should consider that OFAC has made a practice of delaying its decisions on delisting requests, only to issue such decisions upon the filing of complaints in this court to avoid adverse rulings."  *Id.* at 24.  But as discussed above in Part I.A, Plaintiff has not demonstrated that such a practice exists; offers no legal analysis as to how this fits into the sixth *TRAC* factor, *In re Barr Lab'ys*, 930 F.2d at 76 (explaining that evidence of bad faith includes "singling someone out for bad treatment or asserting utter indifference to a congressional deadline"); and fails to overcome the presumption of good faith accorded to public officials, *Beyond Pesticides*, 407 F. Supp. 2d at 41.

The Court should thus dismiss Count I of Plaintiff's Amended Complaint or, in the alternative, grant summary judgment in favor of Defendants.

## II.    OFAC's Decision Accords with the APA

### A.    OFAC's Decision is Entitled to Substantial Deference

When evaluating claims brought pursuant to the APA, a court reviews an agency decision based on the administrative record. *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985) (citing *Citizens to Preserve Overton Park*, 401 U.S. at 420). A court should uphold an agency decision unless it is "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] (D) without observance of procedure required by law[.]"  5 U.S.C. § 706(2).

Under this deferential standard, the agency's decision is presumed valid, and a court reviews only whether that decision "was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park*, 401 U.S. at 416. An agency's decision may be deemed arbitrary and capricious only when it "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency," or its decision "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The court may not "substitute its judgment for that of the agency." *Id*. Rather, the agency's decision should be affirmed as long as it is supported by a rational basis. *Id*. As previously discussed, this deference is further heightened in cases, such as this one, that involve national security and foreign affairs. *See* Part I, above; *see also, e.g.*,

*Olenga*, 507 F. Supp. 3d at 280 (recognizing additional deference beyond that typically accorded to an agency under the APA); *Zevallos*, 10 F. Supp. 3d at 119 (same).

### B.  OFAC's Well-Reasoned Decision Easily Satisfies the APA's Standard

<u>Plaintiff Materially Assisted and Provided Support to Radovan Karadzic.</u>  Applying the highly deferential standard of review required here, the Court should uphold OFAC's decision to deny Plaintiff's petition.  First, OFAC's determination pursuant to EO 13219, § 1(a)(ii)(D), as amended by EO 13304—that Plaintiff "materially assisted in, sponsored, or provided financial, material, or technological support for, or goods or services in support of" Radovan Karadzic, AR at 0001-02, 0010-21—"meets the 'minimal standards of rationality,' and therefore must be upheld[,]" *see Holy Land Found.*, 219 F. Supp. 2d at 74 (quoting *Small Refiner Lead Phase-Down Task Force v. U.S. EPA*, 705 F.2d 506, 521 (D.C. Cir. 1983)).  "[M]ultiple, credible sources of information available to OFAC" indicated that Plaintiff materially assisted and provided support to her husband during his time in hiding after his 1995 indictment and before his 2008 arrest.  AR at 0010-21.  Specifically, OFAC considered the findings of the European Union and High Representative in imposing restrictions against Plaintiff, *id.* at 0001, 0010-11, 0097-100, 0195-96; raids on the homes of Radovan Karadzic's family members, *id.* at 0011-12, 0110-11, 0149-50; Plaintiff's influence over an entity associated with providing support to Radovan Karadzic, *id.* at 0001, 0012-15; and her in-person meetings and correspondence with Radovan Karadzic, *id.* at 0001-02, 0017-21, 0075, 0161, 0200, 0275, 283, 0301, 0391, 0422, 0424—all of which buttress a determination that Plaintiff, as a key member of her husband's network, materially assisted and provided support to Radovan Karadzic within the meaning of EO 13219, § 1(a)(ii)(D), as amended by EO 13304; *see Karadzic*, 602 F. Supp. 3d at 113-14 (upholding designation under EO 13219, § 1(a)(ii)(C)-(D), as amended, where OFAC relied on evidence regarding, among other things, the

High Representative's decision to freeze the plaintiff's bank account, the plaintiff's ownership of an entity that was part of Radovan Karadzic's support network, and the plaintiff's communication with Radovan Karadzic while Radovan Karadzic was in hiding); *Pejcic*, 2021 WL 1209299, at *7 (upholding designation in part based on evidence regarding the High Representative's decision to freeze the plaintiff's bank account).  While Plaintiff may disagree with OFAC's treatment of her self-serving denials, she provides no reason to doubt OFAC's fact-finding process, which prior decisions in this Circuit have upheld.  *E.g.*, *id.* at *8 ("While Pejcic might see the evidence differently, the court does 'not ask whether the record evidence could support the petitioner's view of the issue, but whether it supports the agency's ultimate decision.'" (quoting *Zevallos*, 793 F.3d at 114)); *Zevallos*, 10 F. Supp. 3d at 123 n.9 (finding unpersuasive the plaintiff's argument that "OFAC relied on 'outdated, biased, and incredible sources'" (citation omitted)).

Plaintiff contends that OFAC acted arbitrarily by "retaining the sanctions against [her] based solely on her conduct more than 20 years ago[,]" and despite the arrest of Radovan Karadzic. Pl.'s Mem. at 34.  In other words, Plaintiff essentially argues that OFAC cannot rely on § 1(a)(ii)(D) of EO 13219, as amended, unless it determines that she is engaged in ongoing, sanctionable conduct.  Just as OFAC reasonably considered and rejected this argument at the administrative stage, AR at 0033-34, so too should the Court reject Plaintiff's argument here.

EO 13219, as amended, authorizes the Secretary of the Treasury to designate persons determined "*to have* materially assisted in, sponsored, or provided financial, material, or technological support for, or goods or services in support of, . . . any person listed in or designated pursuant to this order."  EO 13219, § 1(a)(ii)(D), as amended (emphasis added).  The Executive Order thus expressly permits the agency to designate an individual for past conduct.  As Plaintiff's "past support for [Radovan] Karadzic can justify continued sanctions[,]" *Pejcic*, 2021 WL

1209299, at *8, this evidence is sufficient to establish a rational basis for OFAC's decision.  *See id.* at *7 (explaining that a plaintiff "need not be engaged in sanctionable conduct at the time his delisting petition is considered for OFAC to reasonably conclude that he should remain a sanctioned person"); *Karadzic*, 602 F. Supp. 3d at 114 ("[C]ourts in this district facing similar challenges have likewise found that past conduct alone is sufficient for maintaining sanctions."); *Olenga*, 507 F. Supp. 3d at 281-82 ("[T]he President has broad authority under IEEPA and could reasonably conclude that the deterrence of international bad actors, at least at times, requires the imposition of sanctions on those who have retired or moved on to other pursuits.  Such a determination is precisely the type of judgment that is properly left to the President and his advisors and falls outside the judicial ken.").

Nor was OFAC required to accept Plaintiff's argument that the arrest and imprisonment of Radovan Karadzic is the type of changed circumstance that warrants Plaintiff's removal from the SDN List pursuant to 31 C.F.R. § 501.807.  The issue of changed circumstances is typically—though not exclusively, *see* n.9, below—understood in terms of affirmative steps undertaken by the SDN herself.  *Cf.* 31 C.F.R § 501.807(a) ("The blocked person also may propose remedial steps *on the person's part* . . . which the person believes would negate the basis for designation." (emphasis added)).  Here, Radovan Karadzic's detention is not attributable to the efforts of Plaintiff.  To the contrary, Plaintiff made clear that she would refuse to cooperate with authorities, AR at 0022, 0206, and repeatedly disparaged the ICTY, *id.* at 0002, 0021-23, 0162, 0206.

To be sure, Plaintiff is correct that, as a general matter, economic sanctions are not punitive, but rather are designed to bring about a change in behavior.  *See* Pl.'s Mem. at 35.[9]  But the record

---

[9] Sanctions can also serve other important national security and foreign policy goals.  *Dames & Moore*, 453 U.S. at 673 ("The frozen assets serve as a 'bargaining chip' to be used by the President

simply does not demonstrate such a change by Plaintiff.  OFAC found that Plaintiff "has never publicly accepted the ICTY's legitimacy or her husband's conviction, nor taken responsibility for her role in assisting [Radovan Karadzic], nor utilized her platform to dispel harmful alternative narratives about the conflict in the Western Balkans."  AR at 0026.  The Department of State likewise noted that "the U.S. government has not observed [Plaintiff] take adequate steps to demonstrate a change of behavior and distance herself from Radovan Karadzic and his actions in [Bosnia and Herzegovina,]" and "[a]s of today, [Plaintiff] has not expressed remorse for her prior actions, nor has she condemned Radovan Karadzic's actions."  *Id.* at 337; *see id.* at 341 ("While [Plaintiff] did not perpetrate genocide herself, her actions aided and abetted her husband, who was convicted of perpetrating genocide, with no sign of remorse or behavior change.").  Additionally, Plaintiff's argument fails to account for her conduct after the arrest of her husband, nor does it address OFAC's separate conclusion that her designation remains warranted because she has actively obstructed, or poses a significant risk of actively obstructing, the Dayton Accords or the Conclusions of the Peace Implementation Conference.  *See Pejcic*, 2021 WL 1209299, at *8 ("[E]ven if Pejcic's material support for Karadzic has ceased, OFAC could reasonably conclude that Pejcic's independent conduct justifies continued designation.").  Nor can Plaintiff rely on language in EO 13219, as amended, providing that the Secretary of the Treasury has discretion to lift sanctions against designated individuals where warranted by the circumstances.  Pl.'s Mem. at 35.  That section of the Executive Order does not define or otherwise elaborate on what

---

when dealing with a hostile country."); *see also Karadzic*, 602 F. Supp. 3d at 114-15 ("Those goals sometimes change as circumstances change.  It is not unreasonable that sanctions could maintain their usefulness even if the original reasons for implementing them no longer apply.  The Court will not second guess the Executive's permissible policy judgments in this area."); *Olenga*, 507 F. Supp. 3d at 281-82.  And the Court should defer to OFAC's interpretation of § 501.807, not Plaintiff's.  *Advanced Energy United, Inc. v. FERC*, 82 F.4th 1095, 1114 (D.C. Cir. 2023).

circumstances are necessary or sufficient for removal from the SDN List.  *See* EO 13219, § 8, as amended.  "And, if [Plaintiff] has truly made a positive change in [her] behavior that merits relief, [she] can submit evidence of [her] good deeds to OFAC in another request for reconsideration." *Olenga*, 507 F. Supp. 3d at 282; *accord Pejcic*, 2021 WL 1209299, at *8.

       <u>Plaintiff Actively Obstructed or Poses a Significant Risk of Actively Obstructing the Dayton Accords or the Conclusions of the Peace Implementation Conference.</u>  Similarly, the record amply supports OFAC's conclusion pursuant to EO 13219, § 1(a)(ii)(C), as amended by EO 13304, that Plaintiff "has actively obstructed or poses a significant risk of actively obstructing the Dayton Accords or the Conclusions of the Peace Implementation Conference held in London on December 8-9, 1995, including the decisions or conclusions of the High Representative, the Peace Implementation Council or its Steering Board, relating to [Bosnia and Herzegovina.]"  AR at 0002, 0021-26.  OFAC relied on Plaintiff's "attendance at public events glorifying [Radovan Karadzic's] crimes and legacy[,]" *id.* at 0021; *see id.* at 0002, 0021-23, 0344-45, 0408, 0421;[10] her statements publicly defending Radovan Karadzic or distorting facts about the Bosnian war, *id.* at 0021-23, 0158, 0203, 0276, 0303; her refusal to cooperate with the ICTY's efforts to capture Radovan Karadzic, *id.* at 0021-23, 0159, 0182; and her public criticisms of the ICTY, *id.* at 0002, 0021-24, 0162, 0206.  Given the High Representative's emphasis on respecting the legitimacy of

---

[10] Plaintiff complains that OFAC's questionnaires did not ask her specifically about her attendance at certain events praising her husband.  Pl.'s Mem. at 14, 30.  But "OFAC does not have a freestanding duty to solicit [her] input, in advance, as to every basis for its decision." *Pejcic*, 2021 WL 1209299, at *8 (OFAC's regulations "do not prescribe an independent duty to solicit the designated person's opinion on all facts the agency relies upon.").  Indeed, Plaintiff fails to consider that requiring OFAC to confer with a SDN about each piece of inculpatory evidence would greatly hinder the agency's investigative process.  And as described above, OFAC considered much more than just Plaintiff's attendance in reaching its decision, including her contacts with Radovan Karadzic (a topic that OFAC asked Plaintiff about and to which she provided false or misleading responses).

the ICTY's final verdict and the detrimental effect of assisting war criminals such as Radovan Karadzic, *id*. at 0024-25, 0102, 0318—in addition to the overarching importance of combating the denial of genocide, war crimes, and crimes against humanity that took place during the war in Bosnia and Herzegovina, *id*. at 0081—such evidence is highly probative of Plaintiff's past obstruction of the Dayton Accords or the Conclusions of the Peace Implementation Conference, as well as the significant risk she poses of actively obstructing those agreements, *see id*. at 0021-26.   OFAC also reasonably relied on the Department of State's analysis, which advised that removing Plaintiff from the SDN List would be inconsistent with U.S. foreign policy interests in the region.  *Id.* at 0026-32, 0332-42; *see Karadzic*, 602 F. Supp. 3d at 112, 114 (noting that OFAC relied on the Department of State's conclusion that SDN Luka Karadzic "continues to occupy a significant place in political life in the region from which he could amplify alternative histories and destabilizing narratives that undermine the international community's work to advance rule of law in Bosnia and Herzegovina and the Western Balkans writ large"); *Pejcic*, 2021 WL 1209299, at *8 ("By relying on the opinion of a subject-matter expert like the State Department, OFAC marshaled sufficient support for its determination.").

In Plaintiff's view, OFAC's conclusion is unreasonable because "[m]ere presence at events in 2016 and 2018 is not enough to warrant sanctions."  Pl.'s Mem. at 31.  OFAC, however, never claimed as much; its determination was based not merely on these events but also on Plaintiff's public statements regarding Radovan Karadzic, the Bosnian war, and the ICTY.  AR at 0021-26; *see id.* at 0026-32 (considering the Department of State's foreign policy views on Plaintiff's conduct).  It is "the entirety of the administrative record[,]" *Rakhimov*, 2020 WL 1911561, at *6, not two discrete pieces of evidence, which is the touchstone of the Court's review, and the record here readily support OFAC's conclusion.  Moreover, Plaintiff cannot establish that, even if OFAC

erred in its analysis of some of the evidence before it—which is not the case—such error was prejudicial. *See* 5 U.S.C. § 706.

Plaintiff next suggests that her attendance at the cited events is irrelevant to the issue of obstruction because she "didn't say a word." Pl.'s Mem. at 33. But Plaintiff's subjective disagreement with the government's assessment about the significance of her attendance does not undermine OFAC's decision. *See Zevallos*, 793 F.3d at 114. Further, the government reasonably determined that Plaintiff's historical silence is highly significant to showing why sanctions remain warranted. AR at 0025, 0337, 0341.

Nor can Plaintiff cast doubt on the reasonableness of OFAC's decision regarding her past and potential obstruction by noting that "mere presence at the scene of a crime is not sufficient to make one guilty as an aider and abettor." Pl.'s Mem. at 33 (citing *United States v. Williams*, 341 U.S. 58, 65 n.4 (1951)). Plaintiff's efforts to cast herself as simply one in a crowd is unavailing, particularly given that she "maintains a position of considerable prominence in [Bosnia and Herzegovina]." AR at 0024. Moreover, Plaintiff has not been charged with any crime, let alone aiding and abetting. And she cannot simply map principles of criminal law onto challenges to OFAC's designation decisions, as such actions are designed to address not domestic matters but international threats to U.S. national security and foreign policy. *See, e.g.*, 50 U.S.C. § 1701(a); *cf. Karadzic*, 602 F. Supp. 3d at 113 ("[C]omparisons to domestic affairs do little to advance Luka's position in a case involving foreign affairs—an area where courts grant the Executive substantial deference and the Bill of Rights has little applicability."). Further, "it is the 'informed perspective *of the Executive Branch*' that matters for the meaning of obstruction." *Id.* at 111 (citing *Udall v. Tallman*, 380 U.S. 1, 4 (1965)).

Plaintiff's attempts to distinguish *Pejcic* and *Karadzic* are unavailing. She claims that

"[u]nlike Pejcic, she held no leadership positions in any organizations."  Pl.'s Mem. at 32.  But neither OFAC's nor the court's decision was based on that narrow fact.  *See Pejcic*, 2021 WL 1209299, at *7.  Pejcic and Plaintiff are also more alike than she acknowledges, as both failed to distance themselves from the past support of Radovan Karadzic, and both made statements promoting alternative narratives about the Bosnian war and undermining the legitimacy of international courts.  *Id.* at *3, *7; AR at 0021-26.  Similarly, the record belies Plaintiff's claim that, "[u]nlike Luka [Karadzic], she made no public statements" regarding the legitimacy of international courts.  Pl.'s Mem. at 32; *see Karadzic*, 602 F. Supp. 3d at 109, 115; AR at 0021-23.  Regardless, OFAC's determinations are made on a case-by-case basis, with a view toward promoting the national security and foreign policy interests of the United States; that a SDN does not engage in the exact behavior as other SDNs says nothing about a given designation decision.

The Court should also uphold OFAC's decision in light of Plaintiff's submission of false or misleading information, particularly concerning her contacts with Radovan Karadzic while he was in hiding.  AR at 0002, 0017, 0062, 0066   In the delisting process, a SDN "bears the burden of showing that changed circumstances warrant withdrawing [her] designation."  *Joumaa v. Mnuchin*, 798 F. App'x 667, 668 (D.C. Cir. 2020) (citing 31 C.F.R. § 501.807).  "OFAC's findings that [Plaintiff] provided demonstrably false and misleading information . . . are relevant to the conclusion that [she] failed to carry [her] burden."  *Id.* (citations omitted).

As a final matter, even if Plaintiff were able to succeed on her arbitrary and capricious claim (which she cannot), she would not be entitled to an "order . . . to remove [her] from the SDN List[.]"  Am. Compl. ¶ 54(b).  Unlike in a "garden variety civil suit, a district court [in] reviewing a final agency action does not perform its normal role, but instead sits as an appellate tribunal."  *Palisades Gen. Hosp. Inc. v. Leavitt*, 426 F.3d 400 403 (D.C. Cir. 2005) (citation omitted).

Accordingly, "under settled principles of administrative law, when a court reviewing agency action determines that an agency made an error of law, the court's inquiry is at an end: the case must be remanded to the agency for further action consistent with correct legal standards." *Id.*

The Court should thus grant summary judgment in favor of Defendants with respect to Count II of the Amended Complaint.

## III.   Plaintiff Has Failed to State a Claim for Attorney's Fees

Plaintiff's third and final cause of action seeks an award of attorney's fees under EAJA. But a request for fees does not constitute an independent cause of action. "Unlike other judicial relief, the attorney's fees allowed under [EAJA] are not compensable for the injury giving rise to an action. Their award is uniquely separable from the cause of action to be proved at trial." *White v. N.H. Dep't of Emp. Sec.*, 455 U.S. 445, 451-52 (1982). Plaintiff's attempt to litigate attorney's fees as a stand-alone claim is therefore improper.

Plaintiff's request is also premature. EAJA authorizes attorney's fees against the government only where the fee applicant is a "prevailing party," and the statute directs that party to file an application for fees and expenses within 30 days of "final judgment in the action." 28 U.S.C. § 2412(d)(1)(A)-(B). At this juncture, there is not yet a prevailing party or a final judgment. *Cf. Pejcic*, 2021 WL 1209299, at *9.

The Court should therefore reject Plaintiff's attempt to plead an independent claim for fees.

## CONCLUSION

For these reasons, the Court should deny Plaintiff's motion for summary judgment and grant Defendants' motion to dismiss or, in the alternative, cross-motion for summary judgment.

Dated February 27, 2024                    Respectfully submitted,

                                           BRIAN M. BOYNTON
                                           Principal Deputy Assistant Attorney General

DIANE KELLEHER
Assistant Branch Director

*/s/Stuart J. Robinson*
STUART J. ROBINSON
Senior Counsel
United States Department of Justice
Civil Division, Federal Programs Branch
450 Golden Gate Ave.
San Francisco, CA 94102
Tel: (415) 436-6635
Fax: (415) 436-6632
Email: stuart.j.robinson@usdoj.gov
Cal. Bar No. 267183

*Counsel for Defendants*